UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY;<br>ALLSTATE FIRE AND CASUALTY<br>INSURANCE COMPANY; and<br>ALLSTATE PROPERTY AND<br>CASUALTY INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>SOUTHEAST MICHIGAN SURGICAL<br>HOSPITAL, LLC; J. ALAN<br>ROBERTSON, M.D., P.C.; MARTIN<br>QUIROGA, P.C.; COMPREHENSIVE<br>NEUROMONITORING, LLC; J. ALAN<br>ROBERTSON, M.D.; MARTIN<br>QUIROGA, D.O.; and SIDNEY<br>BRODER, M.D.,<br><br>Defendants. | C.A. No. _____<br><br><br><br>**Demand for Jury Trial** |

## **COMPLAINT**

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company (hereinafter collectively referred to as "Allstate" and/or "plaintiffs") hereby allege as follows.

## I.   **INTRODUCTION**

1.    This is a case about a surgical hospital, medical clinics, an intraoperative neuromonitoring ("IONM") provider, and the physicians, owners,

managers, agents, and representatives of the same who engaged in a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent records, bills, and invoices through interstate wires and the U.S. Mail seeking to collect payment from Allstate for treatment and services that were not actually performed, were medically unnecessary, were fraudulently billed, and were not lawfully rendered pursuant to applicable statutes and regulations, including the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*.

2.      The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in payments from Allstate to and on behalf of the defendants pursuant to Michigan's No-Fault Act.

3.      All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

4.      By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment. Allstate also seeks declaratory relief that no previously-denied and pending claims submitted to it by the defendants are compensable.

5.      As a result of the defendants' fraudulent acts, Allstate has paid in excess of $2,397,960 to them related to the patients at issue in this Complaint

## II.   THE PARTIES

### A.   PLAINTIFFS

6.     Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are each companies duly organized and existing under the laws of the State of Illinois.

7.     Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have their respective principal places of business in Northbrook, Illinois.

8.     At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

### B.   DEFENDANTS

#### 1.   Southeast Michigan Surgical Hospital, LLC

9.     Defendant Southeast Michigan Surgical Hospital, LLC ("SE MI Hospital") is organized under the laws of the State of Michigan.

10.    SE MI Hospital uses the registered fictitious names "Insight Surgical Hospital" and "Michigan Surgical Hospital."

11.    SE MI Hospital's members are JSCE Holdings, LLC ("JSCE Holdings") and IINN Holdings, Inc. ("IINN Holdings").

12.    Jawad Shah, M.D. ("Shah") is the sole member of JSCE Holdings, and is a citizen of the State of Michigan.

13.     IINN Holdings is incorporated under the laws of the State of Michigan and has its principal place of business in Flint, Michigan.

14.     At all relevant times, SE MI Hospital was operated and conducted by defendants J. Alan Robertson, M.D., P.C. ("Robertson, P.C."), Martin Quiroga, P.C. ("Quiroga, P.C."), Comprehensive Neuromonitoring, LLC ("Comprehensive Neuromonitoring"), J. Alan Robertson, M.D. ("Robertson"), Martin Quiroga, D.O. ("Quiroga"), and Sidney Broder, M.D. ("Broder").

15.     SE MI Hospital's principal place of business is in Warren, Michigan.

16.     SE MI Hospital billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 1.

**2.     J. Alan Robertson, M.D., P.C.**

17.     Defendant J. Alan Robertson, M.D., P.C. is incorporated under the laws of the State of Michigan.

18.     Robertson, P.C.'s principal place of business is in Eastpointe, Michigan.

19.     At all relevant times, Robertson, P.C. was operated and controlled by defendants SE MI Hospital, Comprehensive Neuromonitoring, Robertson, and Broder.

4

20.     Robertson, P.C. billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 2.

### 3.     Martin Quiroga, P.C.

21.     Defendant Martin Quiroga, P.C. is incorporated under the laws of the State of Michigan.

22.     Quiroga, P.C. also uses the registered fictitious names "MAPS Pharm" and "Michigan Advanced Pain & Spine."

23.     Quiroga, P.C.'s principal place of business is in Warren, Michigan.

24.     At all relevant times, Quiroga, P.C. was operated and controlled by defendants SE MI Hospital and Quiroga.

25.     Quiroga, P.C. billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 3.

### 4.     Comprehensive Neuromonitoring, LLC

26.     Defendant Comprehensive Neuromonitoring, LLC is organized under the laws of the State of Michigan.

27.     Comprehensive Neuromonitoring's sole member is Comprehensive Care Services, Inc., which is incorporated under the laws of the State of Michigan and has a principal place of business in Plymouth, Michigan.

28.     At all relevant times, Comprehensive Neuromonitoring was operated and controlled by defendants SE MI Hospital, Robertson, P.C., Robertson, and Broder.

29.     Comprehensive Neuromonitoring's principal place of business is in Livonia, Michigan.

30.     Comprehensive Neuromonitoring billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 4.

### 5.     J. Alan Robertson, M.D.

31.     Defendant Robertson is a resident and citizen of the State of Michigan.

32.     At all relevant times, Robertson operated and controlled defendants SE MI Hospital, Robertson, P.C., and Comprehensive Neuromonitoring.

### 6.     Martin Quiroga, D.O.

33.     Defendant Quiroga is a resident and citizen of the State of Michigan.

34.     At all relevant times, Quiroga operated and controlled defendants SE MI Hospital and Quiroga, P.C.

### 7.     Sidney Broder, M.D.

35.     Defendant Broder is a resident and citizen of the State of Michigan.

36.     At all relevant times, Broder operated and controlled defendants SE MI Hospital, Robertson, P.C., and Comprehensive Neuromonitoring.

## III.    <u>JURISDICTION AND VENUE</u>

37.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action relating to the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

38.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

39.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

40.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.    <u>BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME</u>

41.     The defendants used the RICO enterprises/clinics discussed herein to submit exorbitant charges to Allstate for purported medical services, procedures, and equipment that were not actually provided, were unlawful, were not medically necessary, and were fraudulently billed.

42.    The scheme to defraud detailed herein was primarily driven by SE MI Hospital, a facility that recruited physicians to bill for medically unnecessary and excessive procedures so that it could submit exorbitant facility fees to Allstate.

43.    In order to maximize the bills to Allstate, SE MI Hospital and the physicians who purported to use its facilities routinely billed for services that were not actually performed, submitted multiple bills seeking payment for the same alleged procedures, and directed patients to undergo unreasonable and unnecessary invasive procedures.

44.    The defendants also increased the total amount billed to Allstate by utilizing medically unnecessary and excessive services for routine procedures, including intraoperative neuromonitoring (billed by defendant Comprehensive Neuromonitoring) for surgeries performed on healthy and low-risk patients, anesthesia services (nearly always unnecessarily billed by both a nurse anesthetist and a medical doctor) for routine injections that never should have been performed in a hospital setting in the first place, and surgical assistants (often billed by defendant Robertson, P.C.), despite such assistants performing nothing beyond normal scrub tech work, if any work was performed at all.

45.    SE MI Hospital ensured that unnecessary procedures would be performed at its facility (to the extent they were performed at all), by intentionally

8

associating with unscrupulous medical providers who have lengthy histories of billing for medically unnecessary and inappropriate patient care.

46.     For example, defendant Quiroga has spent nearly his entire medical career working for or with physicians who have been indicted on and who have pleaded guilty to healthcare fraud charges.

47.     In one investigation, an informant reported to the FBI that Quiroga accepted kickbacks in exchange for patient referrals and saw patients while high on cocaine.

48.     Quiroga himself admitted to FBI agents that he has a history of abusing cocaine, and that he and business associates used cocaine with prostitutes at a medical clinic at which he worked.

49.     Quiroga also described to the FBI an "algorithm" for ordering treatment for patients who claimed to be injured in automobile accidents, including patient referrals for physical therapy, MRIs, and other diagnostic testing regardless of the patients' individual circumstances.

50.     Quiroga further stated that this treatment was ordered even though he believed that patients were malingering and had been coached to report certain symptoms.

51.     In addition to Quiroga, SE MI Hospital's website, on a now-deleted page, touted its association with purported orthopedic surgeons named Sam Hakki, D.O. [sic] ("Hakki") and Labeed Nouri, M.D. ("Nouri"):



52.     Hakki has an extensive disciplinary history in multiple states that has been ongoing for nearly all of the period at issue in this Complaint.

53.     The Michigan Department of Licensing and Regulatory Affairs ("LARA") filed an Administrative Complaint on June 21, 2018 against Hakki with counts alleging that he violated duties to exercise due care and failed to conform to minimal standards for the health profession.

54.     Hakki entered into a consent order on November 5, 2019 in which he expressly admitted that the allegations of the LARA Administrative Complaint are true and that they constitute violations of Michigan's Public Health Code.

55.     Among the information obtained by LARA in its investigation was a report from a hospital in Florida at which Hakki practiced stating "there is substantial evidence that [Hakki] so significantly failed to meet generally-accepted standards of clinical practice as to raise reasonable concern for the safety of patients by repeatedly providing substandard care."

56.     Part of the LARA investigation involved Hakki's misrepresentation of his "credentials" to obtain medical licensure in the State of Michigan, including his concealment that he had pending disciplinary actions in other states when he moved to Michigan.

57.     Nouri had his medical license summarily suspended by the Michigan Board of Medicine after being convicted of a felony.

58.     SE MI Hospital's website, on another now-deleted page, also touted its association with the following purported pain management physicians:



59.     Syed Moosavi, M.D. ("Moosavi") was the subject of an Administrative Complaint by the Michigan Board of Medicine in 2019, which was filed after an investigation that was conducted because Moosavi was among the top 5 prescribers in Macomb County of commonly abused and diverted controlled substances.

60.     The Board of Medicine's investigation found that "[Moosavi's] records appeared to have a 'sameness' to them and do not appear to represent a clinical thought process that is necessary when a physician is treating complex patients taking controlled substances."

61.     Vincent Rampersaud, M.D. was a member of a pain management clinic called Greenfield and 9 Mile Medical Center, PLLC d/b/a American Medical Center, which was the key clinic in a massive fraud scheme involving illegal solicitation of

patients and layperson direction of medical treatment. *See* Allstate Insurance Company, *et al*. v. Kinetix Rehab Services Inc., *et al*., 20-cv-12783-BAF-DRG (E.D. Mich.).

62.   SE MI Hospital also granted privileges to and billed for alleged procedures by physicians who were not able to practice elsewhere due to their histories.

63.   For example, SE MI Hospital billed for alleged procedures by Jeffrey Oppenheimer, M.D. ("Oppenheimer"), a physician who flies to Michigan from Florida to take advantage of Michigan's No-Fault Act, and who has an extraordinary history of malpractice and violations of standards of care.

64.   SE MI Hospital also billed for procedures allegedly performed by David Jankowski, D.O. ("Jankowski"), who has been under indictment since June 7, 2017 for conspiracy to commit healthcare fraud (18 U.S.C. § 1349).   United States v. Jankowski, 17-cr-20401-BAF-DRG (E.D. Mich.).   Jankowski was recently convicted of healthcare fraud.   Id.

65.   The State of Michigan suspended Jankowski's license for three (3) years on April 11, 2019 and fined him $25,000.

66.   Several of the alleged procedures at issue herein for which SE MI Hospital billed facility fees were by physicians who were employed and contracted by a clinic called Mercyland Health Services, PLLC ("Mercyland").

67.   Mercyland was unlawfully organized and operated by a layperson who improperly directed medical care, and all treatments billed by Mercyland were likewise unlawful and non-compensable under the No-Fault Act.

68.   Another physician named Jeffrey Wingate, M.D. ("Wingate"), who allegedly performed several of the procedures at issue herein at SE MI Hospital, obtained patients through his association with a clinic called Spine & Health, PLLC ("Spine & Health").

69.   Spine & Health is ostensibly owned by a physician named William Gonte, M.D., who has a lengthy history of disregard for boundaries of proper medical practice, including a consent order with the Michigan Board of Medicine through which he agreed to probation and a fine related to unethical prescription practices.

70.   On August 26, 2020, Gonte was indicted on seven (7) felony counts in relation to a scheme to defraud an insurance company.  *See* United States of America v. William S. Gonte, *et al*., 20-cr-20380-NGE-DRG (E.D. Mich. 2020).

71.   Gonte created "false medical records" as part of the scheme that "made it appear that [the patient] was in far worse health than she was in actuality."  Id. at ECF 1, ¶ 30.

72.   In reality, Spine & Health was actually controlled by a layperson named Hassan Fayad.

73.    Fayad has a lengthy history of criminal conduct, including pleading guilty to embezzlement, unarmed robbery, attempt to receive stolen property, and served several years in prison.  Fayad was recently indicted related to his operation of several clinics in Michigan.

74.    Gonte and Fayad have both signed affidavits stating that they intend to invoke their Fifth Amendment right against self-incrimination in response to any questioning about purported provision of healthcare, expressly including purported evaluation and treatment at Spine & Health, which purported evaluation and treatment led directly to several of the surgeries for which SE MI Hospital billed at issue in this action.

75.    Other alleged procedures at issue for which SE MI Hospital billed facility fees were by physicians who were employed and contracted by a clinic called Vital Community Care, P.C. ("Vital").

76.    The putative owner of Vital, Namir Zukkoor, M.D., has been charged in Michigan for conducting a criminal enterprise, operating a pharmacy without a license, and insurance fraud.

77.    Further, Vital obtained patients through illegal solicitation done by an entity called Legal Genius.

78.    The owner of Legal Genius, Mathew Carl Schwartz, pleaded guilty in October 2020 to federal felony charges of conspiring to defraud the United States

and to stealing crash reports from the Detroit Police Department, which were used to unlawfully solicit patients.  *See* United States of America v. Mathew Carl Schwartz, 4:20-cr-20263-MFL-APP (E.D. Mich.).

79.    It is not coincidental that SE MI Hospital associated with these physicians with extensive disciplinary and criminal histories; these physicians have compromised practices and limited opportunities to practice in traditional and legitimate hospital settings, and therefore were intentionally targeted by the defendants to generate false and improper bills for submission to Allstate.

80.    SE MI Hospital's association with individuals with criminal and disciplinary histories is not limited to the physicians who ordered the purported services for which SE MI Hospital billed Allstate.

81.    SE MI Hospital has admitted in sworn discovery responses that the exorbitant and unreasonable prices discussed herein were set by David Winter, who is a medical biller residing in Florida.

82.    David Winter has been charged with numerous felony counts in the State of Michigan relating to healthcare fraud and billing for medical services and devices that were never rendered.

83.    As detailed below, SE MI Hospital intentionally worked with physicians, including the defendant physicians named herein, to generate massive charges for services that were not performed, were double- and triple-billed, were

medically unnecessary, were fraudulently unbundled and upcoded, and were charged at outrageous amounts that had no reasonable basis.

84.     Defendants Robertson, P.C., Quiroga, P.C., Comprehensive Neuromonitoring, Robertson, Quiroga, and Broder used SE MI Hospital's unscrupulous practices to generate their own fraudulent and improper bills to Allstate.

85.     As detailed below, Comprehensive Neuromonitoring and Broder billed for alleged IONM that was not performed and which had no medical basis, including in relation to surgeries allegedly performed at SE MI Hospital.

86.     Robertson, P.C. and Robertson regularly billed for unnecessary services allegedly performed at SE MI Hospital, including purported assistant surgeon services that had no explanation or valid basis.

87.     Quiroga, P.C. and Quiroga also routinely billed for unnecessary services at SE MI Hospital, including for invasive procedures that were unreasonable and often contraindicated.

88.     The relationship between SE MI Hospital and the providers with which it associated, including defendants Robertson, P.C., Quiroga, P.C., Comprehensive Neuromonitoring, Robertson, Quiroga, and Broder, was symbiotic.  By encouraging excessive and unnecessary procedures to be performed in its facility, SE MI Hospital was then able to submit exorbitant charges for facility fees.

## V.    BILLING FOR SERVICES NOT RENDERED

89.    The defendants regularly submitted bills to Allstate seeking payment for treatment and services that were never rendered to patients at issue herein.

90.    The defendants' pervasive pattern of faxing and mailing demands for payment for services that were not rendered is indicative of their goal to submit as many bills for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

91.    All of the bills submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking payment for treatment that never occurred are fraudulent.

92.    Allstate is not required to pay the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants as a result of their fraudulent billing for services not rendered.

### A.    BILLING FOR SERVICES NOT RENDERED BY SE MI HOSPITAL

93.    SE MI Hospital, which bills only for the alleged provision of a surgical facility and supplies, may only ever properly bill for the procedures actually performed by the surgeons.

94.     However, many of the bills submitted by SE MI Hospital that are at issue in this action are for different and additional procedures than those reported by operative reports and from those billed by the physicians.

95.     For example, SE MI Hospital routinely billed for purported x-rays during injection procedures for which there is no evidence that such x-rays actually occurred at all.

96.     SE MI Hospital also falsely claimed that procedures that were done percutaneously, if at all, were performed as open incision surgical procedures (which resulted in higher bills to Allstate).

97.     SE MI Hospital (and Quiroga, P.C.) submitted charges using Current Procedural Terminology[1] ("CPT") code 63056, which describes a transpedicular or costovertebral open incision surgical approach, for procedures that were not open, but rather needle-based and visualized by endoscope or fluoroscopy.

98.     For example, purported discectomy procedures on patient T.H. (Claim No. 0486448020)[2] on December 17, 2018 and June 17, 2019 were billed by both SE

---

[1] CPT codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

[2] To protect the confidentiality of the patients at issue herein, Allstate refers to them by initials and Allstate claim number.

MI Hospital and Quiroga, P.C. as open incision procedures, but were actually only minimally-invasive needle-based procedures.

99.    The defendants falsely represented the nature of the procedures actually performed in an attempt to justify charges to Allstate that were many times higher than the percutaneous procedures actually performed.

100.    SE MI Hospital also routinely billed for components of alleged surgeries that did not occur at all, including alleged debridement, lysis, and marrow aspiration, which were nearly always billed among more than a dozen separate charges to conceal that they were not actually performed.

101.    In some instances, SE MI Hospital billed for services that were not performed in its facilities at all.

102.    For example, SE MI Hospital billed more than $3,000 for a routine knee injection to patient R.H. (Claim No. 0474500698) on March 15, 2019.

103.    If any injection was performed on R.H.'s knee at all on that date, it was done in a separate office called Osman Spine Clinic and not in SE MI Hospital's surgical facilities.

104.    Billing for facility fees relative to procedures that did not actually occur in SE MI Hospital's surgical facilities and for which SE MI Hospital provided no services constitutes billing for services not rendered.

105.   Numerous specific examples of SE MI Hospital billing for services not rendered are detailed below.

**B.    BILLING FOR SERVICES NOT RENDERED BY PHYSICIANS**

106.   The physicians who purported to perform services at SE MI Hospital, including defendants Robertson, P.C. and Quiroga, P.C., also billed for procedures that did not occur.

107.   As detailed above, Quiroga, P.C. falsely billed Allstate for purported open incision surgical procedures when, at most, minimally-invasive and needle-based procedures were performed.

108.   Quiroga, P.C. also frequently billed Allstate for the alleged performance of epidurograms during fluoroscopically-guided injections that were never actually performed.

109.   An epidurogram is a diagnostic study used to assess the area in which an injection may be performed prior to performing the injection.

110.   The CPT code used by Quiroga, P.C. to submit charges for epidurograms (72275) expressly directs to "[u]se 72275 only when an epidurogram is performed, images documented, and a formal radiologic report is issued."

111.   Quiroga, P.C. did not produce formal radiologic reports of the alleged epidurograms.

112.   The add-on charges billed by Quiroga, P.C. for alleged epidurograms are nothing more than a fraudulent attempt to induce Allstate to make payment for procedures that were not actually performed.

113.   Robertson, P.C. regularly billed for the alleged performance of surgical assistance during spine surgeries performed by a physician named Michael Kapsokavathis, D.O. ("Kapsokavathis").

114.   Defendant Robertson even referred to Kapsokavathis as his "surgical partner" to patients at issue herein.

115.   But there is no evidence that Robertson actually performed any assistance during Kapsokavathis's purported surgeries, much less the type of assistance of the magnitude necessary to constitute a separately-billable service.

116.   Moreover, Kapsokavathis often performed the exact same types of surgeries at facilities other than SE MI Hospital without any surgical assistance, which confirms that if Robertson, P.C. and Robertson performed any services at all, of which there is no evidence, that they could not have actually been medically necessary.

117.   Specific representative examples of billing for services not rendered by physicians are detailed below.

## C.  BILLING FOR SERVICES NOT RENDERED BY COMPREHENSIVE NEUROMONITORING

118.  Nearly all of the bills submitted to Allstate by Comprehensive Neuromonitoring contain charges for purported IONM services that were not actually performed.

119.  The bills submitted by Comprehensive Neuromonitoring almost always included charges for alleged neuromuscular junction testing that was not performed on the patients at issue in this Complaint.

120.  Neuromuscular junction testing is the stimulation of an individual motor nerve by means of repetitive electrical impulses with measurement of the resulting electrical activity of a muscle supplied by that nerve.

121.  According to the American Association of Neuromuscular and Electrodiagnostic Medicine, neuromuscular junction testing is performed to test disorders such as myasthenia gravis and myasthenic syndrome, both of which are autoimmune diseases.

122.  None of the patients at issue herein were seeking treatment from the defendants for myasthenia gravis or myasthenia syndrome, nor was the diagnosis of these conditions a factor when billing for these tests.

123.  Nevertheless, Comprehensive Neuromonitoring almost always submitted charges using CPT code 95937 to represent that neuromuscular junction

testing was performed as a component of its unreasonable IONM services when, at most, only "train-of-four" monitoring was ever performed.

124.    Train-of-four, which is often abbreviated as "TO4," is a peripheral nerve stimulation used to assess nerve function in patients receiving neuromuscular blocking agents by delivering four (4) electrical impulses.

125.    Unlike neuromuscular junction testing, train-of-four monitoring is a component of IONM that is not separately payable, as it is an integral service to any IONM procedure and thus is inclusive in the primary billing codes.

126.    Comprehensive Neuromonitoring also submitted bills for services it did not render by falsely representing that the services took longer to perform than they actually did in order to inflate the charges submitted to Allstate.

127.    Several of the charges routinely billed by Comprehensive Neuromonitoring, including those for both continuous monitoring in the operating room (CPT code 95940) and remote monitoring (CPT code 95941), are timed codes.

128.    In-person continuous monitoring is billable in fifteen (15) minute increments and remote monitoring is billable in hour-long increments.

129.    For IONM to be billed using CPT codes 95940 or 95941, it must be performed for at least half of the time designated for a full unit.

130.    Time spent monitoring excludes any time to set up, record, and interpret the baseline studies, and to remove electrodes at the end of the procedure.

24

131.   The following chart depicts the calculation of the number of units that may be billed for time spent on IONM:

| CPT 95940 (15-Minute Code) | | | | CPT 95941 (60-Minute Codes) | | |
|---|---|---|---|---|---|---|
| Units | # of Minutes to Start Unit | # of Minutes to End Unit | | Unit | # of Minutes to Start Unit | # of Minutes to End Unit |
| 0 | 0 | 7 | | 0 | 0 | 30 |
| 1 | 8 | 22 | | 1 | 31 | 60 |
| 2 | 23 | 37 | | 2 | 91 | 120 |
| 3 | 38 | 52 | | 3 | 151 | 180 |
| 4 | 53 | 67 | | 4 | 211 | 240 |
| 5 | 68 | 82 | | 5 | 271 | 300 |
| 6 | 83 | 97 | | 6 | 331 | 360 |
| 7 | 98 | 112 | | 7 | 391 | 420 |
| 8 | 113 | 127 | | 8 | 451 | 480 |
| 9 | 128 | 142 | | 9 | 511 | 540 |
| 10 | 143 | 157 | | 10 | 571 | 600 |
| 11 | 158 | 172 | | 11 | 631 | 660 |
| 12 | 173 | 187 | | 12 | 691 | 720 |
| 13 | 188 | 202 | | 13 | 751 | 780 |
| 14 | 203 | 217 | | 14 | 811 | 840 |
| 15 | 218 | 232 | | 15 | 871 | 900 |

132.   Comprehensive Neuromonitoring routinely submitted bills for more units of IONM than were actually performed.

133.   For example, Comprehensive Neuromonitoring billed twenty-one (21) units of alleged monitoring time using CPT code 95940 for patient J.B. (Claim No. 0484341078) on July 10, 2018.

134.   In order to properly bill twenty-one (21) units, the IONM technician would have had to physically be present in the operating room monitoring J.B. for at least 308 minutes.

25

135.   However, the monitoring time lasted only 127 minutes, from 1:36 p.m. until 3:43 p.m.

136.   Accordingly, Comprehensive Neuromonitoring provided no more than eight (8) units of monitoring time under CPT Code 95940, and every unit billed in excess of that constitutes billing for a service that was not provided.

137.   Similarly, Comprehensive Neuromonitoring submitted a bill for alleged IONM services to patient K.V. (Claim No. 0475095872) on March 28, 2018 representing that it provided ten (10) units of face-to-face monitoring time under CPT Code 95940.

138.   The actual total time spent monitoring K.V. was one hour and forty minutes, or a total of 100 minutes.

139.   As such, Comprehensive Neuromonitoring provided only seven (7) units of monitoring time and the additional three (3) units were not provided.

140.   Further specific representative exemplars of billing for services not rendered by Comprehensive Neuromonitoring are detailed below.

D.   SPECIFIC EXAMPLES OF BILLING FOR SERVICES NOT RENDERED

141.   The following are representative examples of the defendants' submission of bills for services that were never actually performed:

   a. SE MI Hospital billed Allstate for facility fees relative to an alleged three-level lumbar procedure by Quiroga to patient T.P. (Claim No. 0192811339) on December 7, 2015.  However, only a two-level procedure was performed.

b. SE MI Hospital and Quiroga, P.C. billed Allstate for alleged open-incision discectomies to patient T.H. (Claim No. 0486448020) on December 17, 2018 and June 17, 2019.  Both procedures were needle-based and minimally invasive, and the bills representing otherwise were fraudulent.

c. SE MI Hospital billed Allstate relative to an alleged procedure by Hakki on patient D.H. (Claim No. 0436257570) on March 27, 2018.  Hakki reported that the procedure involved a manipulation under anesthesia, which was medically unnecessary for the reasons discussed below, and a Mumford procedure, which involves shaving the patient's clavicle in the area of the acromioclavicular joint.  In addition to billing for these two (2) procedures reported by Hakki, and in addition to eleven (11) separate additional unbundled charges (detailed *infra*), SE MI Hospital billed Allstate $12,195.75 for the alleged performance of a separate decompression and partial acromioplasty with coracoacromial ligament release that was not reported by Hakki and was not actually performed.

d. SE MI Hospital billed Allstate relative to an alleged procedure by Hakki on patient D.C. (Claim No. 0461245755) on December 18, 2018.  Hakki reported that the procedure involved a manipulation under anesthesia, which was medically unnecessary for the reasons discussed below, and a Mumford procedure, which involves shaving the patient's clavicle in the area of the acromioclavicular joint.  In addition to billing for these two (2) procedures reported by Hakki, and in addition to eleven (11) separate additional unbundled charges (detailed *infra*), SE MI Hospital billed Allstate $6,097.87 for the alleged performance of lysis with resection of adhesions and another $6,097.87 for the alleged performance of a procedure that is not listed by the American Medical Association's ("AMA") CPT code book.  Neither of these procedures is documented by the operative report, neither was billed by the purported assistant surgeon, and neither was actually performed.

e. SE MI Hospital billed Allstate $14,055.92 for a purported osteopathic manipulation (CPT code 98925) on July 25, 2017 relative to J.L. (Claim No. 0405023326).  The procedure, to the extent performed at all, was done by Hakki, who is an M.D., and a chiropractor, and did not involve an osteopathic physician at all.  Moreover, Hakki and the chiropractor collectively billed less than $1,600 (approximately one-tenth of the

amount billed by SE MI Hospital) and used an entirely different CPT code (22505) to describe the procedure they claim to have performed.

f.   SE MI Hospital billed Allstate relative to an alleged procedure by Hakki on patient K.B. (Claim No. 0540945978) on December 17, 2019. Hakki reported that the procedure was a Mumford procedure, which he billed along with several fraudulently unbundled charges related to decompression and rotator cuff repair.  In addition to billing for the procedure reported by Hakki, and in addition to eight (8) separate additional unbundled charges (detailed *infra*), SE MI Hospital billed Allstate $19,733.33 for the alleged performance of extensive debridement.  Debridement is not separately billable unless it is performed in a separate area to the main surgery, and here, extensive debridement was not performed at all.  Indeed, even the surgical assistant, whose bill was also medically unnecessary, reported that debridement was limited, not extensive.

g.   SE MI Hospital billed Allstate relative to an alleged procedure on patient K.V. (Claim No. 0475095872) on January 17, 2018.  Both SE MI Hospital and the surgeon fraudulently unbundled their bills for the purported procedure, as detailed below.  SE MI Hospital also submitted a separate charge for $6,125.41 that was not reported by the surgeon, for purportedly aspirating bone marrow through a separate incision for a different aspect of the procedure.  This separate aspiration of bone marrow did not occur and SE MI Hospital's bill is for services that were not performed.

h.   SE MI Hospital billed Allstate relative to an alleged procedure on patient M.L. (Claim No. 0487923617) on July 30, 2018.  Both SE MI Hospital and the surgeon fraudulently unbundled their bills and billed for services that were not actually performed.  The surgeon reported that a component of the procedure involved an arthrodesis of the patient's cervical spine, and expressly stated that this involved minimal discectomy and no decompression.  SE MI Hospital instead submitted a charge of $9,671.04 claiming that this component involved a normal discectomy, an osteophytectomy, and decompression of the spinal cord and/or nerve roots.

i.   SE MI Hospital billed Allstate relative to an alleged procedure by Nouri on patient M.Z. (Claim No. 0431010446) on June 1, 2017.  Nouri billed

for the procedure as an arthroscopic decompression of M.Z.'s shoulder. SE MI Hospital billed more than five (5) times the amount as Nouri and misrepresented that the procedure was an open incision acromioplasty.

j.  SE MI Hospital billed Allstate relative to alleged injections performed by Robertson on patient C.D. (Claim No. 0518847926) on May 15, 2019.  In addition to its routine fraudulently unbundled charges, SE MI Hospital billed for the alleged performance of both lumbar and sacroiliac joint x-rays that were not done by defendant Robertson.

k.  SE MI Hospital billed Allstate relative to an alleged procedure by Quiroga on patient T.H. (Claim No. 0486448020) on March 18, 2019. Quiroga called the procedure a biacuplasty, which is an experimental minimally invasive procedure that applies heat to a patient's vertebrae. In an attempt to conceal the experimental nature of this procedure, SE MI Hospital billed using CPT codes describing the performance of an annuloplasty, which is a different surgery.  In total, SE MI Hospital billed more than $68,000 using these falsely reported CPT codes that describe a surgery not performed and its normal routine unbundling of ancillary services and supplies.  Quiroga did not bill Allstate at all for this alleged experimental procedure.

l.  Comprehensive Neuromonitoring billed Allstate relative to an alleged surgery performed by a physician named Lucia Zamorano, M.D. ("Zamorano") at SE MI Hospital on July 18, 2018 to patient S.W. (Claim No. 0485109516).  The bill for the alleged technical component of the IONM reported that only somatosensory evoked potential and electromyography testing was performed.  Zamorano's operative report also reports that only these two IONM tests were performed.  However, Comprehensive Neuromonitoring's bill for the professional component of the IONM services also claimed that neuromuscular junction testing was performed when it was not.  Moreover, the purported surgical procedure was to S.W.'s cervical spine only.  Comprehensive Neuromonitoring billed for alleged somatosensory evoked potential testing to S.W.'s lower extremities, which would have no clinical utility during a cervical spine surgery.  Indeed, this purported lower extremity testing was not performed at all, as Broder reported only attaching electrodes to S.W.'s wrists, which means that the test could not have been performed on S.W.'s lower extremities at all.

142.    Allstate is not required to pay the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants as a result of their fraudulent billing for services not rendered.

## VI.    MULTIPLE BILLING FOR IDENTICAL SERVICES

143.    SE MI Hospital, Robertson, P.C. Quiroga, P.C., and Comprehensive Neuromonitoring also each regularly billed Allstate multiple times for the same purported services.

### A.    MULTIPLE BILLING FOR PROCEDURES

#### 1.    Multiple Billing by SE MI Hospital

144.    Almost every bill submitted SE MI Hospital for facility fees associated with alleged procedures included multiple charges for the same purported services.

145.    When a procedure is performed on an outpatient basis, any facility fee associated with such procedure must be billed using the CPT code(s) that describes the procedure and all drugs, supplies, and ancillary services provided by the facility are included in the charge.

146.    For the vast majority of the procedures at issue, SE MI Hospital billed both CPT codes that are inclusive of all purported services and separate line items for each of the purported services.

147.   In other words, SE MI Hospital fraudulently billed Allstate twice for nearly every service it claims to have performed.

148.   SE MI Hospital's double billing was so pervasive that for many patients improper charges far outnumbered the only claims that could be valid (if services were lawful, necessary, and actually performed, which they were not).

149.   For example, SE MI Hospital submitted sixteen (16) separate charges relative to an alleged routine procedure performed by Quiroga to patient T.H. (Claim No. 0486448020) on December 17, 2018, fourteen (14) of which were double bills for components already included in the facility charge for the procedure itself.

150.   In addition to improperly double billing Allstate for supplies, drugs, and ancillary services that were already included in the charge for procedures themselves, SE MI Hospital regularly billed Allstate for components of procedures that are not separately billable.

151.   In these instances, SE MI Hospital billed Allstate at least three (3) separate times for the exact same purported services.

152.   Among the charges that were routinely fraudulently unbundled by SE MI Hospital in this manner were purported use of fluoroscopy during procedures, debridement and other components of surgical procedures that are necessary and included in the charge for primary procedures, and instrumentation that is included in the cost of alleged procedures.

153.   For example, SE MI Hospital billed Allstate $137,171.98 in facility fees related to a purported spine-fusion surgery billed by Kapsokavathis to patient D. M. (Claim No. 0599301140) on March 4, 2022.  SE MI Hospital fraudulently double- and triple-billed for already included components of the facility fees it charged for six (6) separate procedure codes.

154.   In addition to those six (6) procedure codes, SE MI Hospital fraudulently charged a second time for thirteen (13) itemized charges for various surgical supplies, medicines, recover room observation, and anesthesia that were already included.   SE MI Hospital triple-billed by charging for "diagnostic" fluoroscopy, which was merely the already included method Kapsokavathis allegedly used to visualize and perform the surgical procedures billed.  SE MI Hospital double-or triple-billed fourteen (14) of the twenty (20) itemized charges it submitted to Allstate for this alleged procedure.

155.   As another example, SE MI Hospital billed Allstate more than $99,400 in relation to a purported surgery on November 6, 2018 to patient L.G. (Claim No. 0489899110) (allegedly performed by the illegally layperson-controlled clinic Mercyland).

156.   SE MI Hospital fraudulently billed for the purported procedure to L.G. using both CPT codes and itemized component and supply charges, resulting in twenty-three (23) out of twenty-seven (27) separate charges that were double billed.

157.   SE MI Hospital also fraudulently unbundled the procedure CPT codes, including by submitting separate charges using CPT codes 22845 for anterior instrumentation and 20930 for allograft, both of which alleged services are included in the facility charges for the procedure itself.

158.   SE MI Hospital's fraudulent unbundling combined with its pervasive double billing resulted in Allstate being triple-billed for the alleged procedure to L.G., along with other patients at issue herein.

159.   SE MI Hospital also added charges for alleged manipulations under anesthesia ("MUA") to its bills for purported arthroscopic procedures, particularly those billed by Hakki.

160.   These MUAs, if they were performed at all, were not separately billable unless they were performed to the patient's extremity contralateral to that which was addressed by the primary surgery.

161.   The purported MUAs for which SE MI Hospital routinely billed were never performed to patients' contralateral extremities.  They were included with the charges for the primary procedure solely to add thousands of additional dollars to bill submitted to Allstate.

162.   SE MI Hospital also submitted multiple bills to Allstate seeking separate payment for the same purported procedures.

163.   For example, SE MI Hospital improperly billed Allstate for facility fees in relation to purported office evaluations by Hakki and other physicians (discussed in detail below), where SE MI Hospital provided no service at all to the patient.

164.   For an examination of patient R.H. (Claim No. 0474540028) on March 22, 2019, SE MI Hospital submitted a bill on a HICF Form 1500 seeking payment of $225 and a bill on a UB-04 form seeking payment of $335 for the exact same purported evaluation for which it had no right to seek payment at all.

## 2.   **Multiple Billing by Physicians**

165.   Quiroga, P.C. fraudulently billed Allstate for multiple purported patient evaluations on the dates it allegedly performed procedures.

166.   When a physician performs a procedure like an injection, the procedure necessarily involves an evaluation of the patient and that evaluation is included in the price of the procedure.

167.   Quiroga, P.C. nevertheless submitted separate bills for purported evaluations on the same dates as procedures using separate evaluation and management CPT codes, which is a fraudulent practice that is expressly prohibited.

168.   Robertson, P.C. and Quiroga, P.C. also routinely submitted charges for the performance of fluoroscopy when it was already included in the charges for the underlying service allegedly provided.

169.   Robertson, P.C. attempted to evade detection of this fraudulently unbundled billing by using CPT codes that describe the performance and interpretation of x-rays rather than fluoroscopy, as the CPT code descriptions for the latter expressly state that they cannot be billed in conjunction with the procedures allegedly performed.

170.   Every time Robertson, P.C. billed for alleged injections, it also included a separate charge for purported imaging guidance.

171.   Fluoroscopic guidance and localization is an inclusive component of many injections, including those described by CPT codes 27096, 64479-64484, 64490-64495, and 64633-64636.

172.   Every injection billed by Robertson, P.C. using the above-listed CPT codes already included charges for purported fluoroscopic guidance.

173.   Because fluoroscopy is considered an integral component of nearly all of the injections billed by Robertson, the separate charges submitted by Robertson, P.C. using CPT code 77003 constitute multiple billing for the same purported service.

174.   Quiroga, P.C. also submitted multiple bills for each purported injection by including a separate charge using CPT code 96372 for the act of performing a generic injection, in addition to the primary procedure codes that obviously and necessarily include the act of injecting.

175.   Quiroga, P.C. also routinely submitted multiple charges for alleged urine screens that were medically unnecessary.

176.   Quiroga, P.C. billed for purported urine screens using CPT code 80307, which is a single code that describes all services associated with the alleged performance of the screens.

177.   However, Quiroga, P.C. also fraudulently submitted separate charges, using deleted CPT codes, seeking multiple payments for components of performing urine screens, including testing to confirm the validity of the urine specimens allegedly provided by patients.

178.   Quiroga, P.C. also double-billed Allstate when it purported to perform anesthesia services, by billing an inclusive CPT code that describes all anesthesia services and separate charges that describe the individual components of anesthesia services, including venipuncture, intravenous drug push, and intravenous infusion.

179.   Robertson, P.C. also routinely billed Allstate for alleged professional radiology services that had already been billed by other providers.

180.   Robertson, P.C. aggressively ordered MRIs, x-rays, and CT scans of every body part for which patients subjectively complained of pain.

181.   The studies ordered by Robertson, P.C. were allegedly performed at separate clinics, where radiologists reviewed and prepared reports interpreting the imaging, as is the standard practice.

182.   However, when patients were referred for imaging studies at outside clinics, Robertson, P.C. also regularly billed Allstate for purporting to perform its own interpretation of the images.

183.   Billing for the professional component of radiology services is reserved for the radiologist who actually prepares the formal radiology report that accompanies the study results.

184.   Robertson, P.C.'s purported re-reads of imaging studies are not a billable service, if they were performed at all.

185.   Indeed, Robertson, P.C.'s practice of billing as much as $450 for each imaging study ordered is a brazenly fraudulent practice that is nothing more than a self-kickback for ordering excessive and unnecessary imaging studies.

186.   Robertson ensured that he would have the opportunity to pay himself this kickback for prescribing imaging by insisting on his prescriptions that the patient be given the actual images of the studies:



187.   Robertson, P.C.'s attempt to force Allstate to make second payments for the interpretation of imaging studies is fraudulent and Allstate is entitled to restitution for all such payments it was induced to make by Robertson, P.C.

### 3.   Multiple Billing for IONM

188.   Comprehensive Neuromonitoring also double-billed Allstate for alleged services.

189.   For example, Comprehensive Neuromonitoring submitted bills claiming to have performed two (2) units of SSEP testing using CPT code 95938, which is used when testing is done on all four (4) patient limbs.

190.   As SSEP testing is a continuous service during alleged procedures, and as patients only have four (4) limbs, it is not appropriate to bill this code in multiple units.

191.   Comprehensive Neuromonitoring also routinely billed Allstate for alleged services that were already billed by other providers.

192.   Many of the alleged surgeries for which Comprehensive Neuromonitoring billed for medically unnecessary IONM were performed by a physician named Louis Radden, D.O. ("Radden").

193.   When Radden unnecessarily used IONM during his alleged surgeries, he billed for the professional component of such services, including all of the

individual components and the continuous monitoring of the IONM from inside the operating room.

194.   Comprehensive Neuromonitoring also billed for allegedly performing the professional component of these alleged IONM services, even though the surgeon clearly represented that he was supervising the services by submitting his own bill.

### B.   SPECIFIC EXAMPLES OF MULTIPLE BILLING

195.   The following are representative examples of the defendants' submission of bills seeking multiple payments for the same purported services:

a.   Quiroga, P.C. billed for the alleged performance of a urine screen relative to patient D.D. (Claim Nos. 0422589663 and 0496623810) on April 10, 2018.  Quiroga, P.C. submitted two (2) separate bills reporting that the purported test – which was only performed once as there was only one patient – was performed in relation to two (2) different claimed motor vehicle accidents.   Further, each bill submitted by Quiroga, P.C. sought multiple payments for the same alleged procedures, including for the urine screen itself, and for various components of the urine screen, including urinalysis, creatinine testing, pH testing, and spectrophotometry, nearly all of which were billed using CPT codes that had been deleted and invalid for over a year as of the purported date of service.

b.   Robertson, P.C. fraudulently billed for an alleged initial evaluation of patient W.R. (Claim No. 0248211773) with a separate charge for purported prolonged contact exceeding 90 minutes (discussed further *infra*) on January 22, 2019.  In addition to improper charges for the alleged evaluation, Robertson, P.C. also billed an additional $247.50 for looking at an x-ray film that W.R. had brought to the appointment. Robertson, P.C. then immediately ordered an MRI that was allegedly performed (and billed) by an outside facility.   At W.R.'s next appointment on February 11, 2019, Robertson, P.C. billed an additional

$450 for allegedly reviewing the MRI result. Robertson, P.C. then billed for alleged facet injections, which expressly include the use of fluoroscopic guidance, but nevertheless submitted a separate charge for this included component of the procedure.

c. Quiroga, P.C. billed for an alleged initial evaluation of patient T.H. (Claim No. 0486448020) on November 28, 2018, and for a purported discography on the same date. Quiroga, P.C. submitted eighteen (18) separate charges for this alleged procedure, sixteen (16) of which were fraudulent multiple bills that were included in the primary procedure charges. Among the fraudulent multiple bills were charges for blood draws, injection of anesthesia drugs, and IV infusions. Quiroga, P.C. then billed for an alleged routine sacroiliac joint injection on December 14, 2018 using eleven (11) separate charges, ten (10) of which were fraudulent multiple bills for the same purported services.

d. SE MI Hospital billed for an alleged procedure by Kapsokavathis to patient K.S. (Claim No. 0440197984) on November 29, 2017. Kapsokavathis described the procedure as a total disc replacement and billed using a single code for the procedure and a fraudulently unbundled code for a purported x-ray taken during the procedure. SE MI Hospital billed using the same procedure code as Kapsokavathis, but also billed for six (6) other items, all of which were included in the primary procedure code, including a separate bill for $6,702.30 for a laminectomy that was not performed.

e. Comprehensive Neuromonitoring billed for alleged IONM services in relation to a surgery performed by Radden on patient T.P. (Claim No. 0327585485) on September 28, 2019. Radden billed for performing the professional component of the alleged IONM services, including neuromuscular junction testing (which was not actually performed, as detailed above), somatosensory evoked potentials, electromyography, and continuous monitoring from inside the operating room. Comprehensive Neuromonitoring also billed for the professional component of the alleged IONM services that were performed and billed by Radden, including all of the component tests and for alleged continuous monitoring remotely.

## VII. UNREASONABLE AND UNNECESSARY FRAUDULENT TREATMENT

196. The defendants' willingness to bill Allstate for services that were never rendered and were double- and triple-billed demonstrates their willingness to also bill for treatment that was unreasonable and unnecessary.

197. The defendants' goal was to bill for as much treatment as possible, regardless of whether such treatment was reasonably necessary to the patients' care, recovery, or rehabilitation, and/or arose out of an alleged motor vehicle accident, in order to generate bills submitted to Allstate.

198. The defendants' treatment violated standards of care in the medical community, as services were not indicated, redundant, excessive, and repeated without any objectively documented benefit to the patient.

199. The full extent and pattern of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they allegedly provided was not known to Allstate until it undertook the full investigation that culminated in the filing of this action.

200. The unnecessary treatment billed by the defendants, discussed more fully below, includes, but is not limited to, the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 4.

201.   All of the claims submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking payment for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

202.   Allstate is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid as a result of the defendants' fraud.

203.   None of the above facts were known to Allstate until it undertook its investigation that resulted in the commencement of this action, and are not evident within the four corners of the medical records and bills submitted to Allstate by the defendants.

A.   MEDICALLY UNNECESSARY SURGERIES

204.   SE MI Hospital, Robertson, P.C., and Quiroga, P.C. billed Allstate for surgical procedures that were performed, if at all, solely to generate charges for submission to Allstate.

205.   Patients who presented to the defendant clinics for evaluation were almost invariably recommended to undergo invasive and surgical procedures regardless of their actual medical conditions and prior treatment.

206.   Often, such invasive procedures were recommended and billed by the defendants without reviewing prior treatment records to determine whether prior

conservative therapies had been effective at maintaining or helping patients' symptoms.

207.   Similarly, invasive and surgical procedures were recommended and billed relative to the patients at issue herein even when there existed evidence that patients did not need such aggressive treatment for the relatively minor injuries complained of.

208.   For example, patient D.D. (Claim No. 0422589663) was allegedly evaluated by defendant Quiroga on November 18, 2016, after having undergone a course of treatment with other physicians.

209.   D.D. had a lengthy history of spine problems, including a previously implanted sacral nerve stimulator.

210.   Quiroga nevertheless falsely reported that the onset of D.D.'s pain complaints was when she had her purported motor vehicle accident, and exaggerated D.D.'s pain complaints to 10/10 despite the fact that D.D. had reported to other physicians and physical therapists, including within days of Quiroga's alleged evaluation, that her pain levels were far lower.

211.   Quiroga immediately billed for a cervical epidural steroid injection without reviewing the results of an identical injection performed by a different physician just months prior.

212.   Moreover, without waiting to evaluate how D.D. responded to the injection, Quiroga scheduled surgery to implant a cervical spinal cord stimulator.

213.   In order to create the appearance of justification for the surgery, Quiroga falsely claimed that both conservative treatment and injections had failed, including expressly reporting that D.D.'s "pain level did not improve and in fact worsened."

214.   This is contrary to the reports made by other physicians and by D.D. herself, who in fact reported that her pain levels had decreased to 4-5/10 in response to physical therapy.

215.   In another example, SE MI Hospital has billed Allstate more than $1,671,978 (and Comprehensive Neuromonitoring at least $45,425) relative to a series of procedures to patient K.V. (Claim No. 0475095872), all of which stemmed from complications caused by a medically unnecessary and improper surgery at SE MI Hospital that involved criminally indicted physician Jankowski.

216.   Despite years of complications, including an infection in K.V.'s lower back that required a series of inpatient hospitalizations, SE MI Hospital billed for the alleged performance of lumbar epidural steroid injections, a discography (which is a clinically useless test), and repeat surgeries.

217.   Performing injections and other invasive procedures on a patient with a lengthy and serious history of a large abscess in the same area is clearly and

obviously contraindicated and improper, and was done only to generate additional outrageous charges to Allstate.

218.  In yet another example, patient T.H. (Claim No. 0433796777) testified that her treatment was controlled by a physical therapy clinic called 411 Therapy (which, like Spine & Health, is owned and controlled by layperson Hassan Fayad).

219.  Wingate purportedly evaluated T.H. for Spine & Health on April 9, 2019, at which time the physician who had previously been providing treatment had reported that she had "no radiation into extremities," had performed a lumbar epidural steroid injection with limited improvement, and had not ordered any electrodiagnostic testing.

220.  Without waiting for any confirmation of diagnosis, Wingate aggressively scheduled T.H. for surgeries at SE MI Hospital, which were billed on April 16, 2019 and April 22, 2019.

221.  The purported pre-operative diagnosis that was claimed in an attempt to justify the procedure expressly claimed that T.H. had a left-sided radiculopathy, which had never been confirmed and was not subjectively reported.

222.  In fact, to the extent that Wingate's examination attempted to describe radicular pain, such symptoms were reported in T.H.'s right lower extremity, not her left.

45

223.   Notably, Jankowski billed for purportedly assisting on this surgery, which took place more than two (2) years after he was indicted and several weeks after the Michigan Board of Medicine entered its order suspending his license.

224.   Not surprisingly, T.H. reported to a separate physician in November 2019 that her condition substantially worsened after these procedures.

225.   Many of the medically unnecessary surgeries billed by the defendants were repeated as a matter of course to multiple patients at issue herein, as detailed below.

### 1.   Medically Unnecessary MUA

226.   Among the unnecessary procedures for which SE MI Hospital routinely billed were MUA allegedly performed by Hakki and his associates.

227.   As discussed above, any procedure scheduled by Hakki should have raised immediate concerns in light of his extensive disciplinary history, particularly a procedure such as an MUA that has little to no clinical utility.

228.   MUA involves mobilizing parts of a patient's musculoskeletal system while the patient is sedated and, therefore, unable to tighten his or her muscles and guard against movement.

229.   MUA is considered experimental, investigational, and unproven for use on most areas of the body, including the spine (cervical, lumbar, and thoracic), ankle, finger, hip, pelvis, temporomandibular joint, toe, and wrist.

230.   MUA is generally considered reasonable for treatment of the following conditions only: arthrofibrosis of the knee; arthrofibrosis of the elbow; reduction of a displaced fracture; reduction of an acute dislocation; and adhesive capsulitis (i.e., frozen shoulder).

231.   Because the defendants and their associates used MUA solely to generate charges to Allstate, they did not bill for the performance of MUA in ways that are accepted by the medical community.

232.   Instead, MUA was billed for without regard for whether patients had been diagnosed with a condition for which MUA is potentially effective, or whether conservative treatment had been employed and/or been utilized for a sufficient amount of time to determine if it would relieve the patient's symptoms.

233.   At least one patient, D.H. (Claim No. 0436257570), reported that an MUA billed by SE MI Hospital and allegedly performed by Hakki significantly worsened her condition.

234.   Injections, which are a more conservative and generally accepted treatment, should be performed prior to resorting to MUA.

235.   Moreover, the defendants never documented that patients for whom they billed Allstate for purported MUA had fear or nervousness that would limit the usefulness of manipulation without anesthesia.

236.   In fact, the defendants did not even attempt to perform manipulation without anesthesia before resorting to MUA.

237.   Further, even when patients had undergone conservative therapies before the defendants billed for MUA, including physical therapy and medications, the defendants ignored patients' reports of improvement and nevertheless billed Allstate for unnecessary MUA.

238.   The following are representative examples of improper and medically unnecessary MUA billed by SE MI Hospital:

   a.  Patient C.B. (Claim No. 0474540028) was allegedly involved in a motor vehicle accident on September 6, 2017.  Two (2) days later, C.B. reported to St. John Macomb Hospital ("St. John") where she reported only lumbar spinal pain.  C.B. was then purportedly evaluated by Hakki on October 9, 2017, who "diagnosed" her with general pain and ordered physical therapy.  C.B. experienced immediate improvement from the physical therapy, which was documented, *inter alia*, by a January 10, 2018 report from C.B.'s physical therapy facility, which stated that "the pain in her lower back is better overall."  The following day, January 11, 2018, Hakki determined that "patient is to continue physical therapy" given C.B.'s improvements, and he expressly stated that MUA would only be considered once Hakki obtained and reviewed an MRI. Despite C.B.'s well-documented improvement through conservative treatment and contrary to Hakki's plan that C.B. continue physical therapy and not even consider MUA without additional testing, C.B. was inexplicably referred to SE MI Hospital only five (5) days later on January 16, 2018 for alleged MUA of her spine and pelvis.  Not only was this MUA entirely medically unnecessary given C.B.'s clear improvement through conservative treatment, MUA to the pelvic region is not an accepted treatment and was not an area for which C.B. complained of injury.  Further, C.B. never received any manipulation without anesthesia, injections, or the diagnostic imaging Hakki stated was necessary before the MUA procedure could be considered.  SE MI Hospital billed more than $14,030 for the unnecessary MUA procedure,

including fraudulent multiple bills for medical and sterilization supplies, anesthesia (which was also separately billed by an anesthesia provider), drugs allegedly supplied during the procedure, and a post-procedure "recovery room."

b. Patient E.W. (Claim No. 0474540028) was allegedly involved in a motor vehicle accident on September 6, 2017 and began a course of physical therapy shortly thereafter.  This physical therapy proved highly beneficial and E.W. was evaluated by a physician on January 2, 2018, where he confirmed he no longer experienced any neck pain, had improved back pain, and specifically informed his physician that physical therapy had been helping.  Based on these significant improvements, the physician determined E.W. "may go back to work full time, no restrictions per pt. request."  Despite this confirmation that E.W.'s condition had improved through conservative treatment to a point where he could return to work full time, SE MI Hospital billed for MUA of E.W.'s spine and pelvis on April 3, 2018.  MUA to the pelvic region is not an accepted treatment and E.W. never experienced any pain or injury to his pelvic region.  E.W. was re-examined two (2) days later on April 5, 2018 and the examination confirmed that he had returned to work with no restrictions.

c. On November 20, 2018, SE MI Hospital billed for purported MUA of the spine and pelvis for patient D.W. (Claim No. 0474540028).  MUA to the pelvic region is not an accepted treatment and the pelvic region was not an area for which D.W. complained of any injury.  Further, this MUA contradicted D.W.'s planned course of treatment, as D.W.'s physician ordered him to continue his beneficial course of conservative treatment and remain in physical therapy for at least another six (6) weeks on October 26, 2018, which was less than one (1) month before the alleged MUA.  Indeed, on the same November 20, 2018 date that SE MI Hospital billed for the purported MUA, D.W. reported to his physical therapist that his condition was improving.  SE MI Hospital then billed for a second round of identical MUA on May 14, 2019.  This second MUA was likewise entirely unnecessary, as D.W. had been examined only fifteen (15) days earlier at Osman Spine Clinic PLLC ("Osman Spine") on April 29, 2019 and found to exhibit such significant improvement that he had the ability to return to work while maintaining the same course of medications and physical therapy.

### 2.    <u>Medically Unnecessary IONM</u>

239.    Physicians who allegedly performed procedures at SE MI Hospital routinely used medically unnecessary IONM that was billed by defendant Comprehensive Neuromonitoring to inflate the charges associated with procedures.

240.    To the extent that IONM is a medically accepted procedure during spinal surgeries, it is only used to ensure that patients – particularly those with significant comorbidities or complications – do not suffer additional injury during a procedure.

241.    IONM is not appropriate for all procedures and patients, and is only medically necessary in specific circumstances.

242.    The American Academy of Neurology has issued guidance stating that "[i]ntraoperative monitoring is not medically necessary in situations where historical data and current practices reveal no potential for damage to neural integrity during surgery.  Monitoring under these circumstances will exceed the patient's medical need."

243.    The defendants did not identify any medical reason that the patients at issue herein required IONM to monitor safety for the routine outpatient surgeries that were nearly always billed.

244.    Many of the operative reports for procedures for which Comprehensive Neuromonitoring billed for alleged IONM services do not even mention that such

services were performed, or when IONM services were mentioned, they were addressed in only a cursory manner that evidences that they were not actually used to guide patient care.

245.   Moreover, the IONM billed by Comprehensive Neuromonitoring was done pursuant to a predetermined protocol that had nothing to do with actual medical need.

246.   For nearly every patient at issue herein, Comprehensive Neuromonitoring billed for alleged SSEP, electromyography, and neuromuscular junction testing, regardless of the type of procedure performed or the patient's purported injuries and comorbidities.

247.   For many patients, Comprehensive Neuromonitoring also billed for central motor evoked potential studies, in which electrical stimulation is made at the patient's head and recorded in extremities to ensure that there has not been damage at the spinal level being operated on.

248.   Comprehensive Neuromonitoring always billed for performing central motor evoked potential studies to all four (4) of patients' extremities, despite the fact that the surgeries were always either cervical or lumbar, not both.

249.   In other words, Comprehensive Neuromonitoring always billed for purported testing on extremities that could not have had anything to do with the purported surgery being performed.

250.   As discussed above, Comprehensive Neuromonitoring also billed for alleged testing to patient extremities on which electrodes were not even placed, meaning that such testing could not have been performed at all.

251.   Further, Comprehensive Neuromonitoring billed for purportedly testing areas of patients' bodies that could not have been relevant to the purported surgeries being performed.

252.   The electromyography testing allegedly performed by Comprehensive Neuromonitoring was supposedly intended to detect damage to nerves exiting the spine during surgery, and therefore the monitoring must be performed on the muscles innervated by the nerves that exit the spine at the vertebral levels subject to the alleged surgeries.

253.   Comprehensive Neuromonitoring billed for performing alleged electromyography on muscles that had nothing to do with the alleged surgery performed.

254.   Defendant Broder nearly always reported nothing more than a general statement that electromyography testing was performed in areas consistent with the vertebral levels subject to surgery.

255.   However, Comprehensive Neuromonitoring's technologist reported the specific muscles on which he affixed electrodes, and they did not always correspond to the vertebral levels at which surgery was alleged performed, contrary to the

reports made by Broder (who was not actually in the operating room during procedures).

256.   For example, Comprehensive Neuromonitoring's technologist reported attaching electrodes to muscles corresponding to one patient's L2 through L4 vertebral levels, but the procedure allegedly performed was to the patient's L5-S1 vertebral level.

257.   Performing monitoring on muscles innervated by the patient's L2 through L4 vertebral levels could not have been medically necessary in relation to a procedure that was performed, if at all, several vertebral levels away from the tested nerves.

### 3.   Unnecessary Use of Assistant Surgeons

258.   Robertson, P.C. routinely billed for alleged surgical assistance by Robertson during procedures purportedly performed by Kapsokavathis that were not medically necessary and were done solely to increase the charges submitted to Allstate.

259.   A bill for the services of a surgical assistant is only proper when the billing physician actively assists the primary physician in performing the surgical procedure, and provides more than just ancillary services.

260.   The role of the assistant surgeon must be clearly documented in the operative report in order to establish the medical necessity of having multiple surgeons involved in one procedure.

261.   However, the documentation submitted to Allstate never substantiated the need to have Robertson assist in alleged procedures.

262.   In fact, the extent to which Kapsokavathis ever sought to establish the medical necessity of having Robertson assist during purported surgeries was contained in one (1) simple statement that was included in every operative report where Robertson was involved:

> Due to the nature of complex reconstructive spinal surgery, I enlisted the help of Dr. J Alan Robertson MD for his assistance and a second intraoperative opinion. All key portions of each procedure performed today were performed with the necessary assistance of Dr. Robertson, who himself was also present for the entirety of the surgical procedure.

263.   Aside from this boilerplate statement, Kapsokavathis's operative reports did not describe what role Robertson played in the actual performance of the procedures.

264.   For example, Kapsokavathis billed Allstate for an alleged lumbar surgery performed on patient J.H. (Claim No. 0334819448) at SE MI Hospital on November 16, 2016.

265.   The operative report for this procedure is completely devoid of any reference to services provided by Robertson.

54

266.   Nevertheless, Robertson, P.C. billed Allstate $23,596.41 for alleged surgical assistance, which was medically unnecessary and unsupported by any evidence.

267.   Similarly, Robertson billed Allstate for allegedly providing surgical assistance during a lumbar surgery by Kapsokavathis to patient T.T. (Claim No. 0405596998) on February 22, 2019 at SE MI Hospital.

268.   The operative report submitted by Kapsokavathis did not document or reference Robertson's involvement in the alleged procedure whatsoever.

269.   Robertson billed Allstate $19,415.50 for this procedure despite the lack of any evidence that he actually performed services.

270.   Frequently, Robertson billed for purportedly assisting Kapsokavathis for surgeries that Kapsokavathis had previously performed without any such assistance, confirming that the additional charge for an assistant was not medically necessary.

271.   For example, Kapsokavathis billed for two (2) complex lumbar surgeries performed on patient J.H. (Claim No. 0430317875) at facilities other than SE MI Hospital, including a two-level laminectomy and foraminotomy on July 17, 2017 and a fusion surgery on May 11, 2018.

272.   Kapsokavathis billed for a purported kyphoplasty to patient M.K. (Claim No. 0496977422) at a local hospital other than SE MI Hospital on August 13, 2018.

273.   Because these surgeries were performed at a facility other than SE MI Hospital, Kapsokavathis did them without any unnecessary surgical assistance despite being as complex or more complex than the purported surgeries for which Robertson, P.C. and Robertson billed for unnecessary surgical assistance.

274.   Quiroga, P.C. also billed for unnecessary and inexplicable purported uses of assistant surgeons.

275.   For example, on April 26, 2018, Quiroga, P.C. billed for purported facet injections to patient D.D. (Claim No. 0422589663), which were reported to be the second injections in a series of three (3), and were among dozens of injections billed by Quiroga, P.C. relative to D.D.

276.   Quiroga, P.C. billed for Mayo Mitsuya, D.O. as the primary physician for the purported April 26, 2018 injections, and defendant Quiroga as a purported assistant surgeon, which resulted in nearly doubling the amount billed for this improper alleged procedure.

277.   There is no evidence that Quiroga performed any services at all in relation to these alleged injections, much less services that would rise to the level that would permit billing by an assistant surgeon.

278.   Indeed, the lack of medical necessity for an assistant surgeon for these routine injections is confirmed by the fact that Quiroga, P.C. did not bill for a purported assistant surgeon for the numerous other similar alleged injections performed on D.D.

## B.   MEDICALLY UNNECESSARY INJECTIONS

279.   The defendants subjected their patients to a battery of unnecessary steroid injections, facet joint injections, and other injection-related services.

280.   The performance of invasive procedures, including injections, must be based on adequate and legitimate medical necessity.

281.   Robertson, P.C., Quiroga, P.C., Robertson, and Quiroga ordered injections as a matter of course and to generate charges rather than to provide actual individualized patient treatment.

282.   Robertson, P.C., Quiroga, P.C., Robertson, and Quiroga routinely subjected patients to injections prior to evaluating any responsiveness to conservative modalities of treatment in violation of standards of care.

283.   Moreover, these defendants routinely conflated the injection procedures that are intended to be used for diagnostic purposes with procedures that are intended for therapeutic purposes.

284.   These defendants ignored diagnostic information gleaned from previous injections, and instead persisted in recommending that patients undergo additional rounds of injections to generate bills to Allstate.

285.   Consequently, patients received unjustified invasive procedures that offered little therapeutic efficacy while subjecting the patients to unnecessary risks of infection and the risks associated with anesthesia.

286.   Robertson, P.C., Quiroga, P.C., and SE MI Hospital billed for alleged injections to patients at issue in this Complaint without regard for conservative forms of treatment.

287.   Even in those instances where patients reported improvement from conservative treatment, the defendants nonetheless pushed for injections to be administered.

288.   Robertson, P.C., Quiroga, P.C., Robertson, and Quiroga frequently ordered repeat injections without analyzing the efficacy of prior procedures, in derogation of established standards of care.

289.   Indeed, Robertson, P.C., Quiroga, P.C., Robertson, Quiroga, and SE MI Hospital routinely scheduled patients for multiple injections at once, an improper practice that makes it impossible to evaluate the efficacy of the first (and subsequent) injection.

290.   Applicable standards of care direct that physicians should not perform steroid injections too frequently, usually no more than three (3) times per six (6) month period or four (4) times per year.

291.   Facet injections should not be performed more frequently than once every three (3) months.

292.   Robertson, P.C., Quiroga, P.C., Robertson, Quiroga, and SE MI Hospital disregarded these practice standards, and placed their patients in danger, to maximize the amount of bills submitted to Allstate.

293.   These defendants also failed to use the injections performed for their intended purpose.

294.   For example, medial branch block injections are used to predict a patient's response to a radiofrequency ablation/rhizotomy procedure.

295.   If a patient has a positive response to a medial branch block injection, the standard of care calls for proceeding to a rhizotomy.

296.   However, in order to maximize the amounts charged to Allstate, the defendants repeated medial branch blocks that were reported to have positive outcomes multiple times before performing rhizotomies.

297.   Similarly, the defendants repeated other injections that were designed to provide months of pain relief within just weeks, even when the first injection had provided the intended benefit.

298.   The defendants also maximized the charges submitted to Allstate at the expense of proper patient care by performing multiple types of injections in the same body part at the same time, making it impossible to determine what, if anything, caused any relief reported by the patient.

299.   Use of this type of "shotgun" approach is improper and medically unnecessary, as it deprives the physician of the ability to accurately record which procedure, if either, was beneficial, and therefore cannot be used to inform additional future treatment plans.

300.   SE MI Hospital also billed for purported stem cell injections and platelet rich plasma injections, which were nearly always claimed to have been performed by Hakki, that were not medically necessary, were entirely experimental, and were performed outside of any recognized methodology.

301.   The procedures, as purportedly performed by Hakki, involved harvesting bone marrow material and injecting the material, without manipulation, into joint spaces.

302.   According to relevant medical literature, stem cell aspirate injections are an investigational procedure that, when properly performed, involves manipulation of the harvested bone marrow material in a centrifuge in order to create a concentrate that provides the hypothesized therapeutic benefit.

303. SE MI Hospital and Hakki's failure to process the harvested bone marrow material confirms that there is no possible therapeutic benefit to this already experimental procedure.

304. Regardless of the improper methods used, SE MI Hospital's billing for these experimental procedures was never medically necessary to treat the routine orthopedic and soft tissue injuries diagnosed for the patients at issue herein.

305. The following patients are representative examples of the medically unnecessary and improper injections for which the defendants billed Allstate:

a. Defendants Quiroga, P.C. and Quiroga subjected patient D.D. (Claim No. 0422589663) to an incredible number of injection procedures that far exceeded any appropriate standard of care. In one instance, Quiroga billed for a series of knee injections from April to June of 2017, despite the fact that when D.D. had previously undergone physical therapy to her knee in November 2016, she was able to manage her pain levels down to a barely perceptible 0-1/10. Quiroga also routinely scheduled D.D. for injections to be performed in series, including scheduling three (3) lumbar epidural steroid injections on July 16, 2017 to be performed "two to four weeks apart" from each other. These pre-determined injections were particularly improper, because Quiroga had previously used D.D.'s supposed lack of response to lumbar epidural steroid injections to justify billing for a kyphoplasty surgery. Moreover, these lumbar epidural injections were performed despite express findings that D.D. did not have numbness or tingling, which are the symptoms that would justify the performance of this type of injection in the first place. Less than a week after billing for the last of this series of lumbar epidural steroid injections on August 23, 2017, Quiroga scheduled D.D. for a series of three (3) medial branch blocks on August 29, 2017. As noted above, medial branch blocks are even more improper to pre-schedule as a series, as the procedure is intended to be diagnostic and to determine whether the patient should undergo a rhizotomy. Indeed, Quiroga's awareness of this proper purpose for medial branch blocks was confirmed when he later ordered yet another series on April 10,

2018, and noted that there was already a determination that D.D. would proceed with a rhizotomy thereafter.  Remarkably, there is no evidence that Quiroga analyzed the efficacy of these medial branch blocks before billing for a rhizotomy on May 9, 2018.

b. Patient C.D. (Claim No. 0518847926) was allegedly evaluated at Robertson, P.C. on November 13, 2018.  C.D. presented with significant comorbidities, including an amputated right leg, a hip fusion, and complications related to polio.  Robertson fraudulently billed for reviewing x-ray images brought by C.D., and also inexplicably ordered both a lumbar MRI and a lumbar CT scan (both of which he fraudulently billed for reviewing at the following appointment).  Robertson, P.C. then allegedly re-evaluated C.D. and recommended a slate of injections and invasive procedures, most of which were declined by C.D.  When Robertson, P.C. finally coerced C.D. to undergo a series of injection in May 2019, Robertson, P.C. and SE MI Hospital billed for a right sacroiliac injection and bilateral, multi-level lumbar facet blocks all at the same time, which necessarily vitiated the diagnostic relevance of the procedures.

## VIII.  FRAUDULENT BILLING

306.   Providers like the defendants have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

307.   The defendants failed to meet this responsibility and instead submitted bills to Allstate for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra*.

308.   All of the medical records, bills, and invoices submitted to Allstate by, and on behalf of, the defendants contained CPT Codes.

309.   The bills submitted to Allstate by the defendants were submitted on Health Insurance Claim Forms ("HICF") approved by the National Uniform Claim Committee ("NUCC") and referenced in the NUCC Instruction Manual.

310.   The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

311.   Despite the warning on the back of the HICF forms, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Allstate through interstate wires and the U.S. Mail.

## A.   FRAUDULENT FACILITY FEE BILLING

312.   As detailed above, SE MI Hospital double- and triple-billed for nearly every alleged procedure performed at its facility by submitting both procedure codes and independent component line item charges for outpatient procedures.

313.   Starting in or about May 2019, defendant SE MI Hospital also began submitting charges to Allstate each time a patient presented for alleged evaluation with physicians associated with the hospital, including Hakki.

314.   The physicians and medical clinics that purportedly performed these evaluations are not part of SE MI Hospital and SE MI Hospital has no control or oversight over their operations.

315.   Despite the lack of any connection with SE MI Hospital beyond a possible agreement to use space within SE MI Hospital's building, SE MI Hospital billed Allstate hundreds of dollars each time a patient was allegedly evaluated by these physicians and clinics.

316.   For most of these improper charges, SE MI Hospital submitted bills using healthcare common procedure coding system ("HCPCS") billing code G0463.

317.   According to published guidelines, bills using HCPCS code G0463 are only properly submitted by "provider-based" facilities.

318.   Provider-based facilities are those that "have functioned as single entities while owning and operating multiple provider-based departments, locations, and facilities that were treated as part of the main provider for Medicare purposes."

319.   In order to qualify for provider-based status, and thus properly charge an insurer a facility fee for routine evaluations, a provider must "operate[] under the same license" as the main provider.  42 C.F.R. § 413.65(d)(1).

320.   Further, pursuant to 42 C.F.R. § 413.65(d)(2), in order to qualify as a provider-based facility that may properly submit charges for facility fees:

(1) Professional staff of the facility or organization must have clinical privileges at the main provider.

(2) The main provider maintains the same monitoring and oversight of the facility or organization as it does for any other department of the provider.

(3) The medical director of the facility or organization seeking provider-based status maintains a reporting relationship with the chief medical

officer or other similar official of the main provider that has the same frequency, intensity, and level of accountability that exists in the relationship between the medical director of a department of the main provider and the chief medical officer or other similar official of the main provider, and is under the same type of supervision and accountability as any other director, medical or otherwise of the main provider.

(4) Medical staff committees or other professional committees at the main provider are responsible for medical activities in the facility or organization, including quality assurance, utilization review, and the coordination and integration of services, to the extent practicable, between the facility or organization seeking provider-based stats and the main provider.

(5) Inpatient and outpatient services of the facility or organization and the main provider are integrated, and patients treated at the facility or organization who require further care have full access to all services of the main provider and are referred where appropriate to the corresponding inpatient or outpatient department or service of the main provider.

321.   The facility seeking provider-based status must also be "fully integrated within the financial system of the main provider, as evidenced by shared income and expenses . . . ." 42 C.F.R. § 413.65(d)(3).

322.   None of these criteria apply to the relationship between SE MI Hospital and the physicians who allegedly performed the evaluations for which SE MI Hospital billed facility fees.

323.   Allstate has no obligation to pay SE MI Hospital any facility fees for routine patient evaluations as it has no business relationship with the physicians who allegedly performed such evaluations apart from agreements to rent space and exercises no control or supervision over the evaluations purportedly rendered.

### B. FRAUDULENTLY UPCODED OFFICE VISITS

324. Physician examinations of patients are billed using CPT codes that reflect the complexity involved in the examination and it is the responsibility of the provider to select the appropriate CPT code for the complexity involved in the examination.

325. The defendants routinely billed Allstate for the most complex examinations possible despite performing examinations that were simple, brief, and cursory, if they were performed at all.

326. There are five (5) levels at which an office visit/examination or office consultation can be billed, with level one being the least involved examination and level five being the most complex.

327. Initial office visits/examinations are billed using a CPT Code that starts with the numbers "9920"; reexaminations are billed using a CPT Code that starts with the numbers "9921"; and consultations are billed using a CPT Code that starts with the numbers "9924."

328. The final number to complete each five-digit CPT Code for examinations and consultations is one (1) through five (5), depending on the complexity of the evaluation performed.

329.   To properly bill using level 5 complexity codes, the physician must have taken a comprehensive history, performed a comprehensive examination, and engaged in medical decision-making of high complexity.

330.   To properly bill using level 4 complexity codes, the physician must have taken a comprehensive (initial encounter) or detailed (reevaluation) history, performed a comprehensive (initial encounter) or detailed (reevaluation) examination, and engaged in medical decision-making of moderate complexity.

331.   The American Medical Association ("AMA") has guided that level 5 initial examinations should involve approximately 60 minutes of face-to-face time with the patient, and level 5 reexaminations should involve approximately 40 minutes of face-to-face time with the patient.

332.   Level 4 initial examinations typically involve 45 minutes of face-to-face time and level 4 reexaminations typically involve 25 minutes of face-to-face time.

333.   Defendants Robertson, P.C., Quiroga, P.C., Robertson, and Quiroga billed for level four and five examinations for initial office visits (i.e., CPT Codes 99204 and 99205) for the vast majority of patients at issue in this Complaint.  *See* Exhibits 2 and 3.

334.   Robertson, P.C., Quiroga, P.C., Robertson, and Quiroga also primarily billed for level four and five examinations for follow-up visits (i.e., CPT codes 99214 and 99215).  Id.

335.   These defendants' examinations fell woefully short of meeting the AMA's threshold standard to bill for level four or five office visits.

336.   All bills submitted by Robertson, P.C., Quiroga, P.C., Robertson, and Quiroga using CPT codes 99204, 99205, 99214, and 99215 were done so as a matter of course rather than based on an independent assessment of the complexity of medical decision-making were fraudulent.

337.   The actual patient examinations, to the extent they were performed at all, were never as complex as represented by these defendants' bills.

338.   In addition to upcoding routine office visits, Robertson, P.C. and Robertson frequently submitted additional charges for alleged "prolonged" office visits that were always improper.

339.   Prolonged physician services are billed using add-on CPT codes 99354–99355 that must be reported in conjunction with their companion office visit/examination codes, as outlined above.

340.   To properly bill for a prolonged office visit/examination using CPT code 99354, the physician must provide direct, face-to-face contact with the patient that lasts at least thirty (30) minutes beyond the average time set forth by the

companion code used for the underlying office visit/examination (for example, 99213 or 99214).

341.   Physician services that last less than thirty (30) minutes beyond the underlying office visit/examination do not meet the threshold time for billing for prolonged services and thus are not separately payable.

342.   CPT code 99355 is used to bill for each additional thirty (30) minutes beyond the first hour of prolonged services.

343.   Because time is a determining factor, documentation regarding the duration (including the start and end time) and content of the office visit/examination, as well as the prolonged services billed, must be included in the patient records.

344.   When an office visit/examination primarily focuses on providing counseling and/or coordination of care, the physician must document the start and end times of the visit along with an attestation of time as the controlling factor.

345.   Robertson, P.C. and Robertson did not meet these requirements to bill for prolonged services.

346.   For example, Robertson, P.C. and Robertson billed Allstate for an alleged 80-minute prolonged office visit/exam with patient E.B. (Claim No. 0426104378) on December 6, 2016 using CPT codes 99214 and 99354.

347.   There was no physical examination of E.B. on this date and the history obtained from the patient was limited and noted to be "unchanged" from her initial examination on November 21, 2016:

PHYSICAL EXAMINATION:

Unchanged from 11-21-16.

348.   In fact, Robertson's record clearly demonstrates that the focus of this visit was essentially to persuade E.B. to undergo a cervical procedure, which Robertson had already "tentatively" scheduled for two weeks later on December 21, 2016.

349.   Robertson concluded the office visit by referring E.B. to Kapsokavathis for an alleged "pre-surgical work up" that was not medically necessary and was done solely to increase the charges submitted to Allstate.

350.   Robertson made similar false claims relative to alleged evaluations of patient M.S. (Claim No. 0249996339) on May 13, 2016 and August 18, 2016.

351.   On both dates, Robertson claimed to have spent a total duration of 70 minutes with M.S., although neither record includes the start time or end time of Robertson's alleged services.

352.   Moreover, the associated records on both dates of service reflect a cursory examination at best, while focusing on the decision to move to surgery and/or perform injections.

353. Neither office visit met the requirements for billing a level four examination or prolonged services.

354. The defendants' pervasive upcoding was designed to increase charges submitted to Allstate, and Allstate is not obligated to pay for examinations that fall woefully short of meeting the threshold standard for legitimate treatment.

C.   FRAUDULENT USE OF CPT CODE MODIFIERS

355. CPT code modifiers are used to indicate to payors that a service or procedure has been altered by some specific circumstance.

356. The CPT code modifier that was most frequently abused by the defendants was modifier 59, which is used to report that charges that are ordinarily not permitted to be submitted together are proper because there was a separate patient encounter or procedure on the same date of service.

357. Appending modifier 59 to CPT Codes indiscriminately is a deceptive practice intended to bypass claim adjudication systems that would detect fraudulent unbundling.

358. Indeed, the federal government has released a publication warning providers that CPT code modifier 59 was being overused and was associated with cases of fraud and abuse.

359. Nevertheless, the defendants regularly used CPT code modifier 59 to falsely represent that services were performed separately from the alleged procedure.

360.   Quiroga, P.C. and Quiroga routinely submitted bills to Allstate using CPT code modifier 59 on dates when he purported to perform injections the same day as patient examinations, which are not separately payable when performed on the same day.

361.   SE MI Hospital routinely used CPT code modifier 59 to escape detection for its fraudulently unbundled procedure code bills discussed above.

362.   The defendants' use of CPT code modifier 59 was an intentional misrepresentation that was made specifically to elude reviews of their billing that would have identified their charges as improper

### D. IMPROPER BILLING DURING GLOBAL POST-SURGERY PERIODS

363.   Billing regulations provide that the cost of many of the surgeries and procedures billed by the defendants include all necessary services furnished before, during, and after a procedure, in what is referred to as the "global surgery package."

364.   Post-surgery services include subsequent evaluations and pain management related to the surgery.

365.   Periods during which post-surgery services are included in the cost of the procedure vary based on the procedure performed, but are generally either ten (10) days for relatively minor procedures or 90 days for surgeries.

366.   For procedures that include a 90-day global surgery package, the global period includes the day prior to the surgery, the day of the surgery, and 90 days following the surgery.

367.   Even when there is no post-surgery period applicable to a procedure, services performed on the date of a procedure are generally not payable as a separate service.

368.   The defendants frequently improperly charged for examinations billed on the same day as purported injections and surgical procedures as well as examinations performed the day before a surgical procedure, which is included in the global period.

369.   The defendants also frequently submitted improper charges for post-operative examinations billed within the 90-day global period following a procedure.

370.   The following patients exemplify the defendants' fraudulent practice of submitting charges for examinations that are included in the global period for procedures:

   a.   Robertson, P.C. billed for a lumbar surgery allegedly performed to patient R.H. (Claim No. 0288967334) on May 20, 2015.  The surgical procedure billed includes a 90-day global package, which includes the day before the actual procedure date.   In violation of this billing restriction period, Robertson, P.C. submitted two (2) separate charges for an alleged "prolonged examination" with Robertson on May 19, 2015.  Only seven (7) days after this purported surgery, Robertson, P.C. billed Allstate for a May 27, 2015 office visit with Robertson billed as a level four examination.  One month later on June 29, 2015, Robertson,

P.C. submitted yet another improper level four examination charge as part of R.H.'s follow-up to the surgical procedure.

b. Quiroga, P.C. billed for an alleged discogram on November 28, 2018 to patient T.H. (Claim No. 0486448020).  The charge for a discogram includes any evaluation performed on the date of the procedure. Nevertheless, Quiroga, P.C. also submitted charges for an alleged level five initial examination on the date of this purported service.  Quiroga, P.C. and SE MI Hospital then billed for an alleged discectomy of T.H. on December 17, 2018, which is a procedure with a 90-day global period.  Just two (2) days later, on December 19, 2018, Quiroga, P.C. billed for an alleged evaluation that was solely to address surgery-related chest pain and clearly was covered by the global package. Quiroga, P.C. was aware that it was not entitled to bill for this evaluation, because it did not submit an evaluation charge for its first scheduled post-surgery examination on December 27, 2018.  Quiroga, P.C. also billed for an additional evaluation within the post-surgery global period on January 10, 2019.

371.   The defendants submitted claims for payment and accompanying medical records relative to Allstate insureds through the U.S. Mail and interstate wires for examinations fraudulently billed separately from procedures, and Allstate relied upon the same in adjusting the claims.

372.   Allstate is not required to pay the defendants for examinations performed during global billing restriction periods, and is entitled to a return of the monies it paid as a result of the defendants' fraudulent submissions.

## IX.    EXCESSIVE AND UNREASONABLE CHARGES

373.   Each of the defendants routinely billed Allstate at rates that were unreasonable and had no relation to the services allegedly performed.

### A.    EXCESSIVE AND UNREASONABLE CHARGES FOR PROCEDURES

374.   The amounts the defendants billed Allstate for the routine and outpatient procedures at issue herein were outrageous and far exceed the reasonable amount that is permitted to be charged by the No-Fault Act.

375.   For example, each of the purported spinal surgeries billed by SE MI Hospital resulted in hundreds of thousands of dollars of unreasonable charges submitted by the defendants and their co-conspirators.

376.   The following chart documents the charges submitted relative to a single procedure to patient K.V. (Claim No. 0475095872) on January 3, 2020:

| Provider | Bill Amount |
|---|---|
| Surgeon | $214,680.00 |
| SE MI Hospital | $407,247.24 |
| Assistant Surgeon | $54,021.00 |
| Anesthesia M.D. | $15,227.24 |
| CRNA | $13,150.52 |
| IONM | $102,028.00 |
| Total Charge | **$806,354.00** |

377.   Each of the routine outpatient surgeries billed by the defendants resulted in unreasonable charges that were driven by SE MI Hospital's outrageous bill amounts, extensive double- and triple-billing, billing for services not rendered, and fraudulent unbundling.

378.   The unreasonable charge amounts were also caused by SE MI Hospital inexplicably multiplying its charge amounts for procedures that required the same level of service and supplies.

379.   For example, SE MI Hospital billed $6,097.69 for a purported shoulder arthroscopy to patient D.C. (Claim No. 0461245755) on December 18, 2018 using CPT code 29824.

380.   Less than fifteen (15) months later, on March 3, 2020, SE MI Hospital billed $34,550 for the same procedure using the same CPT code relative to patient N.J. (Claim No. 0487475527).

381.   There is no reasonable or valid basis for the cost of a routine arthroscopy to increase by more than 500% in just over a year; SE MI Hospital simply decided that it would charge Allstate as much as it wanted.

382.   Similarly, SE MI Hospital billed $7,754.53 for an alleged discectomy (that was falsely billed as an open incision procedure, as detailed above) on patient T.H. (Claim No. 0486448020) on December 17, 2018.

383.   Just six (6) months later, on June 17, 2019, SE MI Hospital billed more than six (6) times that amount – $50,395 – for the same purported procedure.

384.   The total amounts billed by the defendants and their associates for routine surgeries regularly exceeded $100,000, which far exceeds the average costs for such procedures.

385.   For example, an article published in August 2017 surveyed the costs of lumbar laminectomies for 181,267 patients throughout the country, and found that the average cost was $11,405, which is just a fraction of the amounts routinely billed by the defendants.  Corinna C. Zygourakis, M.D., *et al*., *Geographic and Hospital Variation in Cost of Lumbar Laminectomy and Lumbar Fusion for Degenerative Conditions*, 81 NEUROSURG 331-340 (2017).

386.   An article published in October 2019 surveyed the costs of arthroscopic shoulder rotator cuff repair surgery for 40,618 patients throughout the country, and found that the average cost of this surgery was $25,353.  Lambert Li, *et al*., *The primary cost drivers of arthroscopic rotator cuff repair surgery: a cost-minimization analysis of 40,618 cases*, 28 JOURNAL OF SHOULDER AND ELBOW SURGERY 1977-1982 (2019).

387.   The amounts of the defendants' charges have no relationship to the cost or value of the services allegedly performed, and they were selected only to maximize the amount of charges to Allstate.

388.    SE MI Hospital also used its unreasonable and inflated charge amounts to enter into contacts to sell its accounts receivable generated by such charges to third parties, including Genesis Alternative Finance IV LLC.

389.    SE MI Hospital's sales of its accounts receivable were for a predetermined percentage that was a fraction of the amount it billed to Allstate.

390.    These contracts provided SE MI Hospital with a significant financial motivation to bill Allstate for as many purported services as possible – including through the billing for services not rendered, double billing, unnecessary treatment, and fraudulent unbundling addressed above – and to charge unreasonable amounts for such purported services, to maximize the amount it would receive pursuant to the percentage-based contracts with the purchasers of its accounts receivable.

391.    Unreasonable charges are not compensable under the No-Fault Act and Allstate has no obligation to pay the defendants the outrageous amounts billed.

## X.    MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A.    MISREPRESENTATIONS BY THE DEFENDANTS

392.    To induce Allstate to pay promptly their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they referred and billed for were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

78

393.    Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." Mich. Comp. Laws § 500.3107(1)(a).

394.    Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]." Mich. Comp. Laws § 500.3157(1).

395.    Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

396.    There are no less than twelve (12) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

    a.  SE MI Hospital, Robertson, P.C., Quiroga, P.C., Comprehensive Neuromonitoring, Robertson, Quiroga, and Broder routinely billed for services that were not performed at all.

    b.  SE MI Hospital billed for procedures that were not performed in its facilities.

    c.  Nearly all of the bills submitted to Allstate by Comprehensive Neuromonitoring contain charges for purported IONM services that were not actually performed.

d. SE MI Hospital, Robertson, P.C., Quiroga, P.C., Comprehensive Neuromonitoring, Robertson, Quiroga, and Broder each regularly billed Allstate multiple times for the same purported services.

e. Comprehensive Neuromonitoring also routinely billed Allstate for alleged services that were already billed by other providers.

f. SE MI Hospital, Robertson, P.C., Quiroga, P.C., Robertson, and Quiroga billed Allstate for unnecessary surgical procedures that were performed, if at all, solely to generate charges for submission to Allstate.

g. Physicians who allegedly performed procedures at SE MI Hospital routinely used medically unnecessary IONM that was billed by Comprehensive Neuromonitoring to inflate the charges associated with the procedures.

h. Robertson, P.C. and Robertson routinely billed for alleged surgical assistance by Robertson during procedures that were not medically necessary and were done solely to increase the charges submitted to Allstate.

i. Robertson, P.C., Quiroga, P.C., Robertson, and Quiroga subjected their patients to a battery of unnecessary steroid injections, facet joint injections, and other injection-related services for which they billed Allstate.

j. SE MI Hospital, Robertson, P.C., Quiroga, P.C., Comprehensive Neuromonitoring, Robertson, Quiroga, and Broder fraudulently used improper CPT codes and CPT code modifiers to bill for more expensive medical services than what were actually provided to patients.

k. SE MI Hospital, Robertson, P.C., Quiroga, P.C., Robertson, and Quiroga fraudulently billed for post-surgery services that were already included in their prior "global surgery package" charges.

l. SE MI Hospital submitted bills at rates that had absolutely no basis and were many times higher than reasonable to charge for services, if such services were rendered at all.

397.   As detailed *supra*, the defendants frequently violated established standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

398.   If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

399.   The foregoing facts – billing for services not rendered, double- and triple-billing, billing for unnecessary procedures, and using fraudulent billing practices – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

400.   Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the services billed by the defendants unnecessary and unlawful.

401.   The fact of unnecessary treatment is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 through 4.

402.   Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act faxed and mailed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

403.   Moreover, each HICF submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

404.   Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via the interstate wires and the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, testing, procedures, and ancillary services for which they billed Allstate.

405.   As the defendants did not render lawful and reasonably necessary medical treatment and testing, and misrepresented the treatment and testing purportedly performed, each bill and accompanying documentation faxed or mailed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

### B.   ALLSTATE'S JUSTIFIABLE RELIANCE

406.   The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

407.   At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of services allegedly provided

and referred by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under the No-Fault Act.

408.  These misrepresentations include submitting false medical documentation, including HICFs, regarding the fact, lawfulness, and necessity of medical treatment, testing, and services in order to seek payment under Michigan's No-Fault Act.

409.  Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

410.  Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

411.  In reliance on the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

412.  Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services billed.

413.   As a result, Allstate has paid in excess of $2,397,960 to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for payment under the Michigan No-Fault Act.

## XI.   MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

414.   As discussed above, the referrals, treatment, and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

415.   The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibits 1 through 4, was to collect No-Fault benefits to which the defendants were not entitled because the medical services rendered, if at all, were not necessary and were not lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

416.   This objective necessarily required the submission of bills for payment to Allstate.

417.   The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service or sent through faxes over interstate wires.

418.   All documents, medical records, notes, reports, HICFs, bills, medical diagnoses, letters, correspondence, and requests for payment in connection with the

insurance claims referenced throughout this pleading traveled through faxes over interstate wires or the U.S. Mail.

419.   All medical records and bills submitted through interstate wires by the defendants were faxed from the defendants in Michigan to Allstate in Iowa.

420.   Allstate received all medical records and bills faxed to it by the defendants in Iowa.

421.   Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim and insurance payments.

422.   It was foreseeable to the defendants that faxing bills and medical records to Allstate would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Allstate.

423.   Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

424.   The fraudulent medical billing scheme detailed herein generated hundreds of mailings and faxes.

425.   A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 5.

426.   As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via fax or mail related to each exemplar patient discussed in this Complaint.

427.   It was within the ordinary course of business for SE MI Hospital, Robertson, P.C., Quiroga, P.C., and Comprehensive Neuromonitoring (the "entity defendants") to submit claims for No-Fault payment to insurance carriers like Allstate through interstate wires and the U.S. Mail.

428.   Moreover, the business of billing for medical services by each of the entity defendants at issue herein is regularly conducted by fraudulently seeking payment to which each entity defendant is not entitled through the use of fraudulent communications sent via intestate wires and the U.S. Mail.

429.   In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for each of the entity defendants.

430.   The entity defendants, at the direction and with the knowledge of their owners and managers (including Robertson, Quiroga, and Broder), continue to submit claims for payment to Allstate and, in some instances, continue to commence litigation against Allstate seeking to collect on unpaid claims.

431.   Thus, the defendants' commission of mail and wire fraud continues.

432.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

433.   As several of the defendants named herein agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

434.   Allstate reasonably relied on the submissions it received from SE MI Hospital, Robertson, P.C., Quiroga, P.C., and Comprehensive Neuromonitoring, including the representative submissions set out in Exhibits 1 through 5 annexed hereto and identified in the exemplar patients above.

435.   As the defendants agreed to pursue the same criminal objective (namely, mail and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XII.   **DAMAGES**

436.   The pattern of fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

437.   Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $2,397,960.

438.   Exhibit 6 (SE MI Hospital), Exhibit 7 (Robertson, P.C.), Exhibit 8 (Quiroga, P.C.), and Exhibit 9 (Comprehensive Neuromonitoring), annexed hereto and incorporated herein as if set forth in their entirety, identify monies paid by Allstate to the defendants by date, payor, patient claim number, check number, and amount.

439.   Allstate's claim for compensatory damages, as set out in Exhibits 6 through 9, does not include payment made with respect to any Assigned Claim Facility/Michigan Automobile Insurance Placement Facility claimant.

440.   Every payment identified in Exhibits 6 through 9 was made by Allstate alone.

441.   Every payment identified in Exhibits 6 through 9 derives from a check sent by Allstate to the defendants through the U.S. Mail.

442.   As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only faxed and mailed medical records and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

443.   Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed and faxed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

444.   Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XIII.  <u>CAUSES OF ACTION</u>

<div align="center">

### <u>COUNT I</u>
### VIOLATION OF 18 U.S.C. § 1962(c)
### (SE MI Hospital Enterprise)
### Against J. Alan Robertson, M.D., P.C., Martin Quiroga, P.C., Comprehensive Neuromonitoring, LLC, J. Alan Robertson, M.D., Martin Quiroga, D.O., and Sidney Broder, M.D.

</div>

445.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 444 set forth above as if fully set forth herein.

446.   SE MI Hospital constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

447.   In connection with the claims identified in the within Complaint, defendants Robertson, P.C., Quiroga, P.C., Comprehensive Neuromonitoring, Robertson, Quiroga, and Broder ("Count I defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by SE MI Hospital, or knew that such false medical documentation would be faxed and mailed in the

<div align="center">89</div>

ordinary course of SE MI Hospital's business, or should have reasonably foreseen that the mailing of such false medical documentation by SE MI Hospital would occur, in furtherance of the Count I defendants' scheme to defraud.

448. The Count I defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 5.

449. As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for facility services that were purportedly performed by SE MI Hospital, which they knew would be billed by SE MI Hospital, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

450. Robertson, P.C., Quiroga, P.C., Robertson, and Quiroga utilized SE MI Hospital's facilities to bill for improper and unnecessary procedures, which allowed SE MI Hospital to bill Allstate for services that were not necessary and not actually performed.

451. Comprehensive Neuromonitoring and Broder utilized SE MI Hospital's facilities to bill for unnecessary intraoperative neuromonitoring, which generated additional charges billed by SE MI Hospital and created the appearance of surgical procedures that were more complex than they actually were.

452.   The Count I defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of medical necessity and permitted SE MI Hospital to continue billing for unlawful and medically unnecessary facility services.

453.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to SE MI Hospital for the benefit of the Count I defendants that would not otherwise have been paid.

454.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

455.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
## VIOLATION OF 18 U.S.C. § 1962(d)
### (SE MI Hospital Enterprise)
**Against J. Alan Robertson, M.D., P.C., Martin Quiroga, P.C., Comprehensive Neuromonitoring, LLC, J. Alan Robertson, M.D., Martin Quiroga, D.O., and Sidney Broder, M.D.**

456.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 444 set forth above as if fully set forth herein.

457. Defendants Robertson, P.C., Quiroga, P.C., Comprehensive Neuromonitoring, Robertson, Quiroga, and Broder ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of SE MI Hospital.

458. The Count II defendants each agreed to further, facilitate, support, and operate the SE MI Hospital enterprise.

459. As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

460. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of SE MI Hospital even though SE MI Hospital was not eligible to collect such payments by virtue of its unlawful conduct.

461. The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim documents and medical record documents containing material misrepresentations.

462. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count II defendants' unlawful conduct described herein.

463. By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to

recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Robertson, P.C. Enterprise)
### Against Southeast Michigan Surgical Hospital, LLC, Comprehensive Neuromonitoring, LLC, J. Alan Robertson, M.D., and Sidney Broder, M.D.

464.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 444 set forth above as if fully set forth herein.

465.    Robertson, P.C. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

466.    In connection with the claims identified in the within Complaint, defendants SE MI Hospital, Comprehensive Neuromonitoring, Robertson, and Broder ("Count III defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Robertson, P.C., or knew that such false medical documentation would be faxed and mailed in the ordinary course of Robertson, P.C.'s business, or should have reasonably foreseen that the mailing of such false medical documentation by Robertson, P.C. would occur, in furtherance of the Count III defendants' scheme to defraud.

467.    The Count III defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates,

including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 5.

468.    As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Robertson, P.C., which they knew would be billed by Robertson, P.C., in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

469.    Robertson owned, managed, and controlled Robertson, P.C. and was responsible for all actions taken by Robertson, P.C. and its staff.

470.    SE MI Hospital provided Robertson, P.C. with facilities at which to bill for medically unnecessary procedures, if the procedures were performed at all.

471.    Comprehensive Neuromonitoring and Broder billed for ancillary services relative to procedures allegedly performed by Robertson, P.C. to create an appearance of medical complexity that did not actually exist, which allowed Robertson, P.C. to continue billing Allstate for unlawful and medically unnecessary procedures.

472.    As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued

payment drafts to Robertson, P.C. for the benefit of the Count III defendants that would not otherwise have been paid.

473.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

474.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<div align="center">

**COUNT IV**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Robertson, P.C. Enterprise)**
**Against Southeast Michigan Surgical Hospital, LLC, Comprehensive Neuromonitoring, LLC, J. Alan Robertson, M.D., and Sidney Broder, M.D.**

</div>

475.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 444 set forth above as if fully set forth herein.

476.   Defendants SE MI Hospital, Comprehensive Neuromonitoring, Robertson, and Broder ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Robertson, P.C.

477.   The Count IV defendants each agreed to further, facilitate, support, and operate the Robertson, P.C. enterprise.

478.   As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

479.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Robertson, P.C. even though Robertson, P.C. was not eligible to collect such payments by virtue of its unlawful conduct.

480.   The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim documents and medical record documents containing material misrepresentations.

481.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count IV defendants' unlawful conduct described herein.

482.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
## VIOLATION OF 18 U.S.C. § 1962(c)
## (Quiroga, P.C. Enterprise)
## Against Southeast Michigan Surgical Hospital, LLC and
## Martin Quiroga, D.O.

483.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 444 set forth above as if fully set forth herein.

484.   Quiroga, P.C. constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

485.   In connection with the claims identified in the within Complaint, SE MI Hospital and Quiroga ("Count V defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Quiroga, P.C., or knew that such false medical documentation would be faxed and mailed in the ordinary course of Quiroga, P.C.'s business, or should have reasonably foreseen that the mailing of such false medical documentation by Quiroga, P.C. would occur, in furtherance of the Count V defendants' scheme to defraud.

486.   The Count V defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 5.

487.   As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would

be submitted to Allstate for medical services that were purportedly performed by Quiroga, P.C., which they knew would be billed by Quiroga, P.C., in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

488.   Quiroga owned, managed, and controlled Quiroga, P.C. and was responsible for all actions taken by Quiroga, P.C. and its staff.

489.   SE MI Hospital provided Quiroga, P.C. with facilities at which to bill for medically unnecessary procedures, if the procedures were performed at all.

490.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Quiroga, P.C. for the benefit of the Count V defendants that would not otherwise have been paid.

491.   The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

492.   By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Quiroga, P.C. Enterprise)**
**Against Southeast Michigan Surgical Hospital, LLC and**
**Martin Quiroga, D.O.**

493.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 444 set forth above as if fully set forth herein.

494.   Defendants SE MI Hospital and Quiroga ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Quiroga, P.C.

495.   The Count VI defendants each agreed to further, facilitate, support, and operate the Quiroga, P.C. enterprise.

496.   As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

497.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Quiroga, P.C. even though Quiroga, P.C. was not eligible to collect such payments by virtue of its unlawful conduct.

498.   The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

499.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count VI defendants' unlawful conduct described herein.

500.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VII**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Comprehensive Neuromonitoring Enterprise)**
**Against Southeast Michigan Surgical Hospital, LLC, J. Alan Robertson, M.D.,**
**P.C., J. Alan Robertson, M.D., and Sidney Broder, M.D.**

501.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 444 set forth above as if fully set forth herein.

502.   Comprehensive Neuromonitoring constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

503.   In connection with the claims identified in the within Complaint, SE MI Hospital, Robertson, P.C., Robertson, and Broder ("Count VII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Comprehensive Neuromonitoring, or knew that such false medical

100

documentation would be faxed and mailed in the ordinary course of Comprehensive Neuromonitoring's business, or should have reasonably foreseen that the mailing of such false medical documentation by Comprehensive Neuromonitoring would occur, in furtherance of the Count VII defendants' scheme to defraud.

504.   The Count VII defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 5.

505.   As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Comprehensive Neuromonitoring, which they knew would be billed by Comprehensive Neuromonitoring, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

506.   Broder   owned,   managed,   and   controlled   Comprehensive Neuromonitoring and was responsible for all actions taken by Comprehensive Neuromonitoring and its staff.

507.   SE MI Hospital allowed Comprehensive Neuromonitoring to utilize its facility to bill for medically unnecessary IONM.

508.   Robertson, P.C. and Robertson ordered medically unnecessary IONM for procedures to allow Comprehensive Neuromonitoring to generate fraudulent bills and continue billing Allstate for unlawful and medically unnecessary IONM.

509.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Comprehensive Neuromonitoring for the benefit of the Count VII defendants that would not otherwise have been paid.

510.   The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

511.   By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**<u>COUNT VIII</u>**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Comprehensive Neuromonitoring Enterprise)**
**Against Southeast Michigan Surgical Hospital, LLC, J. Alan Robertson, M.D., P.C., J. Alan Robertson, M.D., and Sidney Broder, M.D.**

512.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 444 set forth above as if fully set forth herein.

513. Defendants SE MI Hospital, Robertson, P.C., Robertson, and Broder ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Comprehensive Neuromonitoring.

514. The Count VIII defendants each agreed to further, facilitate, support, and operate the Comprehensive Neuromonitoring enterprise.

515. As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

516. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Comprehensive Neuromonitoring even though Comprehensive Neuromonitoring was not eligible to collect such payments by virtue of its unlawful conduct.

517. The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim documents and medical record documents containing material misrepresentations.

518. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count VIII defendants' unlawful conduct described herein.

519.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
## COMMON LAW FRAUD
### Against All Defendants

520.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 444 set forth above as if fully set forth herein.

521.   The scheme to defraud perpetrated by SE MI Hospital, Robertson, P.C., Quiroga, P.C., Comprehensive Neuromonitoring, Robertson, Quiroga, and Broder ("Count IX defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect benefits pursuant to applicable provisions of the Michigan No-Fault Act.

522.   The misrepresentations of fact made by the Count IX defendants include, but are not limited to, those material misrepresentations discussed in section X.A, *supra*.

523.   The Count IX defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

524.   The misrepresentations were intentionally made by the Count IX defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment pursuant to applicable provisions of the Michigan No-Fault Act would be submitted to Allstate.

525.   The Count IX defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

526.   Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

527.   As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

**COUNT X**
**CIVIL CONSPIRACY**
**Against All Defendants**

528.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 444 set forth above as if fully set forth herein.

529.   Defendants SE MI Hospital, Robertson, P.C., Quiroga, P.C., Comprehensive Neuromonitoring, Robertson, Quiroga, and Broder ("Count X

defendants") combined and acted in concert to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment pursuant to applicable provisions of the Michigan No-Fault Act to which they were not entitled because (1) the defendants did not actually render the services for which claims were submitted, (2) the defendants did not provide reasonably necessary medical services, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices.

530.  The Count X defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

531.  This purpose was known to all of the Count X defendants and intentionally pursued.

532.  Despite knowing that the defendants were not entitled to payment pursuant to applicable provisions of the Michigan No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they engaged in fraudulent billing practices, the Count X defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment.

533.   In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

534.   All of the Count X defendants directly benefited from the payments made to SE MI Hospital, Robertson, P.C., Quiroga, P.C., and Comprehensive Neuromonitoring.

535.   All of the Count X defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count X defendants in the commission of acts done for the benefit of all Count X defendants and to the unjustified detriment of Allstate.

536.   Accordingly, all of the Count X defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

<div align="center">

**COUNT XI**
**PAYMENT UNDER MISTAKE OF FACT**
**Against Southeast Michigan Surgical Hospital, LLC, J. Alan Robertson, M.D., P.C., Martin Quiroga, P.C., and Comprehensive Neuromonitoring, LLC**

</div>

537.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 444 above as if fully set forth herein.

538.   Allstate paid the amounts described herein and itemized in Exhibits 6 through 9 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the fact, lawfulness, and necessity of services billed by SE MI Hospital, Robertson, P.C., Quiroga, P.C., and Comprehensive Neuromonitoring ("Count XI defendants").

539.   Allstate sustained damages by paying under a mistake of fact the claims submitted by the Count XI defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services allegedly rendered.

540.   The Count XI defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

541.   Allstate is entitled to restitution from each of the Count XI defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

542.   The Count XI defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

<u>COUNT XII</u>
**UNJUST ENRICHMENT**
**Against All Defendants**

543.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 444 set forth above as if fully set forth herein.

544.   Defendants SE MI Hospital, Robertson, P.C., Quiroga, P.C., Comprehensive Neuromonitoring, Robertson, Quiroga, and Broder ("Count XII defendants") submitted, caused to be submitted, or benefited from claims submitted to Allstate that caused Allstate to pay money, in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

545.   Allstate's payments constitute a benefit which the Count XII defendants aggressively sought and voluntarily accepted.

546.   The Count XII defendants wrongfully obtained or benefited from payments from Allstate through the fraudulent scheme detailed herein.

547.   The Count XII defendants have been unjustly enriched by receipt of and benefit from these wrongfully obtained payments from Allstate.

548.   The Count XII defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XIII
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

549.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 444 set forth above as if fully set forth herein.

550.   Defendants SE MI Hospital, Robertson, P.C., Quiroga, P.C., Comprehensive Neuromonitoring, Robertson, Quiroga, and Broder ("Count XIII defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

551.   The Count XIII defendants also billed for services not rendered.

552.   Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment

arising out of a motor vehicle accident.  Mich. Comp. Laws §§ 500.3105, 500.3107, and 500.3157(1).

553.   The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107.

554.   Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

555.   The Count XIII defendants continue to submit claims under applicable provisions of the Michigan No-Fault Act for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

556.   The Count XIII defendants will continue to submit claims under applicable provisions of the Michigan No-Fault Act absent a declaration by this Court that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by any of the Count XIII defendants for any or all of the reasons set out in the within Complaint.

557.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIII defendants billed for

unnecessary and unlawful treatment that is not compensable under applicable provisions of the Michigan No-Fault Act.

558.   Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIII defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

559.   As such, the Count XIII defendants have no standing to submit, pursue, or receive benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIII defendants cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the conduct detailed in the within Complaint.

560.   Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIII defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the conduct detailed in the within Complaint.

## XIV. **DEMAND FOR RELIEF**

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company respectfully pray that judgment enter in their favor as follows:

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(SE MI Hospital Enterprise)**
**Against J. Alan Robertson, M.D., P.C., Martin Quiroga, P.C., Comprehensive Neuromonitoring, LLC, J. Alan Robertson, M.D., Martin Quiroga, D.O., and Sidney Broder, M.D.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(SE MI Hospital Enterprise)**
**Against J. Alan Robertson, M.D., P.C., Martin Quiroga, P.C., Comprehensive Neuromonitoring, LLC, J. Alan Robertson, M.D., Martin Quiroga, D.O., and Sidney Broder, M.D.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

112

Case 2:22-cv-11684-SJM-EAS   ECF No. 1, PageID.113   Filed 07/22/22   Page 113 of 119

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Robertson, P.C. Enterprise)
**Against Southeast Michigan Surgical Hospital, LLC, Comprehensive Neuromonitoring, LLC, J. Alan Robertson, M.D., and Sidney Broder, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Robertson, P.C. Enterprise)
**Against Southeast Michigan Surgical Hospital, LLC, Comprehensive Neuromonitoring, LLC, J. Alan Robertson, M.D., and Sidney Broder, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Quiroga, P.C. Enterprise)
### Against Southeast Michigan Surgical Hospital, LLC and
### Martin Quiroga, D.O.

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Quiroga, P.C. Enterprise)
### Against Southeast Michigan Surgical Hospital, LLC and
### Martin Quiroga, D.O.

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Comprehensive Neuromonitoring Enterprise)
### Against Southeast Michigan Surgical Hospital, LLC, J. Alan Robertson, M.D., P.C., J. Alan Robertson, M.D., and Sidney Broder, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Comprehensive Neuromonitoring Enterprise)
### Against Southeast Michigan Surgical Hospital, LLC, J. Alan Robertson, M.D., P.C., J. Alan Robertson, M.D., and Sidney Broder, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IX
### COMMON LAW FRAUD
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT X
### CIVIL CONSPIRACY
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XI
## PAYMENT UNDER MISTAKE OF FACT
**Against Southeast Michigan Surgical Hospital, LLC, J. Alan Robertson, M.D., P.C., Martin Quiroga, P.C., and Comprehensive Neuromonitoring, LLC**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XII
## UNJUST ENRICHMENT
**Against All Defendants**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XIII
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
**Against All Defendants**

(a)     DECLARE that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by Southeast Michigan Surgical Hospital, LLC, J. Alan Robertson, M.D., P.C., Martin Quiroga, P.C., Comprehensive Neuromonitoring, LLC, J. Alan Robertson, M.D., Martin Quiroga, D.O., and Sidney Broder, M.D., jointly and severally, for any or all of the reasons set out in the within Complaint;

(b)     DECLARE that Southeast Michigan Surgical Hospital, LLC, J. Alan Robertson, M.D., P.C., Martin Quiroga, P.C., Comprehensive Neuromonitoring,

LLC, J. Alan Robertson, M.D., Martin Quiroga, D.O., and Sidney Broder, M.D., jointly and severally, cannot seek payment from Allstate pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the conduct detailed in the within Complaint;

(c)     DECLARE that Southeast Michigan Surgical Hospital, LLC, J. Alan Robertson, M.D., P.C., Martin Quiroga, P.C., Comprehensive Neuromonitoring, LLC, J. Alan Robertson, M.D., Martin Quiroga, D.O., and Sidney Broder, M.D., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the conduct detailed in the within Complaint; and

(d)     GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XV.     **DEMAND FOR JURY TRIAL**

The plaintiffs hereby demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

KING, TILDEN, MCETTRICK & BRINK,

*/s/ Andrew H. DeNinno*

_____
Nathan A. Tilden (P76969)
ntilden@ktmpc.com
Andrew H. DeNinno
adeninno@ktmpc.com
William G. Potter
wpotter@ktmpc.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

Dated:  July 22, 2022                          *Attorneys for Plaintiffs*